Corina VELA, Appellant,

v.

MARYWOOD, Appellee.

No. 03–98–00663–CV.

Court of Appeals of Texas,
Austin.

April 27, 2000.

William H. Alberts, Mcleroy, Alberts & Benjamin, Austin, for appellant.

Oliver C. Perkins, Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

This case presents the question of how forthright a licensed child-placing agency must be with an unmarried, expectant mother who seeks its counsel prior to the birth of her child. The child's mother, Corina Vela, is an exemplary young woman who made a mistake. The district court held that the law compels the compounding of her error, terminated her parental rights, and appointed appellee Marywood managing conservator of her child.[1] Corina appeals the district-court judgment.

---

1. The alleged and probable father executed an affidavit of waiver of interest. See Tex. Fam. Code Ann. § 161.106 (West 1996 & Supp. 2000). The district court's judgment also ter-

## FACTUAL BACKGROUND

In September 1997, Corina, then nineteen years of age and unmarried, learned she was pregnant. At the time of the district-court trial, Corina, still living with her parents, had completed two years at Austin Community College where she had earned high grades and was planning to attend Southwest Texas State University. Corina is a member of a strong, stable, and supportive family. Her parents have been married for more than twenty-five years and have lived in the same house for over twenty years. They both hold long-term government jobs and are community leaders who volunteer at recreation centers, in political campaigns, and with senior-citizen groups. Corina herself has volunteered at her church, with Big Brothers/Big Sisters, in the neonatal unit at Brackenridge Hospital, and with her eight-year-old sister's Brownie troop. Corina has participated in various school activities and dances with a dance company. There is no evidence that Corina has abused drugs or alcohol or is in any way irresponsible. In fact, all evidence is to the contrary. A state senator and a well-known community activist both testified to the outstanding character of Corina and her family. A neighbor who had lived next to the Velas for over twenty-one years said that Corina is the envy of all the mothers in the neighborhood.

In February 1998, this pregnant young woman sought counseling services from Marywood, a licensed child-placing agency. *See* 40 Tex. Admin. Code §§ 720.24–.67 (1999). Corina had seen a Marywood advertisement and requested information; Marywood mailed her an "admission assessment form" that inquired about her and her family, why she sought services

from Marywood, and her views about adoption. Corina completed and returned the form. She met with a Marywood counselor, Aundra Moore, several times in early March.[2] During these meetings, Corina informed Moore that she wanted to place her child for adoption. In Moore's view, Corina was adamant that her child have a future, be in a two-parent family, be safe, and have the security of a family. Moore observed that Corina wanted "the best for her child" and felt that adoption "was the place to go with that."[3] Corina indicated to Moore that her parents could help but she didn't want to burden them. Moore told Corina that "the adoption process is very much at [Corina's] discretion" and that Corina's "wishes and requests" as to what type of family she would place her child with and what type of relationship she would have with her child after adoption would be "considered." At a meeting on March 16, Corina reported to Moore that she had bonded with her unborn child, and Moore noted that Corina "may be grasping the difficulty of her decision."

On March 25, Corina and Moore discussed what Marywood terms an "open adoption," a process by which the birth mother expresses her criteria for adoptive parents. Corina requested a Mexican–American, Catholic couple who had no other children. She also told Moore that "she wanted to visit with the child after the adoption." Moore informed Corina that "her relationship with the adoptive family would establish what type of ongoing relationship [with her child] she would have."

Moore first showed Corina an "Affidavit of Voluntary Relinquishment of Parental Rights" (the "relinquishment affidavit") on March 30. *See* Tex. Fam.Code Ann. § 161.103 (West Supp.2000).[4] Moore did

---

minated any rights he may have had with regard to the child, and he is not a party to this appeal.

**2.** Moore describes herself as "a maternity counselor ... responsible for working with birth parents and their families ... in finding options for an unplanned pregnancy."

**3.** Unless otherwise indicated, all quotations in the factual background are taken from Moore's testimony at trial.

**4.** In pertinent part, the relinquishment affidavit reads:

It is in the best interest of my child that the child be placed for adoption in a suit-

not discuss the relinquishment ·affidavit with Corina and did not explain the meaning of the term "irrevocable"; rather, Moore simply "showed her the form" but did not give her a copy to take with her to study. At the March 30 meeting, Corina signed only an "Affidavit of Status" concerning the identity of the father.[5]

Corina selected an adoptive couple at her next counseling session with Moore and had a face-to-face meeting with them on April 8. The meeting lasted about an hour. The prospective adoptive parents met all of Corina's criteria and indicated their willingness to comply with post-adoption visits. Throughout Corina's counseling sessions, she and Moore discussed a "sharing plan," a standard practice of Marywood. A sharing plan ostensibly allows the birth mother to select the adoptive family, visit her child on a regular basis after the adoption, and exchange letters and pictures. The adoptive parents are aware of the plan prior to placement and agree in writing with Marywood to conform to this arrangement. Significantly, the birth mother does not sign this agreement; thus, neither Marywood nor the adoptive parents enter into any agreement with the birth.mother. Marywood admits that aside from advocating that the adoptive parents abide by the plan, Marywood can do nothing if the adoptive parents decide, post-adoption, to disregard it. In fact, the executive director of Marywood admits that the sharing plan is an "empty promise." Clearly, the birth mother has no power to enforce such an agreement. Marywood never discussed the unenforceability of the sharing plan with Corina.

At Corina's last meeting with Moore before her child's birth, they discussed the procedures at the hospital and the various documents Corina would have to sign at the hospital, including a temporary foster-care request. Moore also discussed the relinquishment affidavit with. Corina. Moore read the affidavit to Corina and "talk[ed] about each paragraph, what each paragraph means, what it is saying." Moore also asked Corina if she had any questions. Although Moore did not first

---

able home by an agency licensed by the Texas Department of Protective and Regulatory Services to place children for adoption. I therefore designate MARYWOOD, 510 West 26th Street, Austin, Texas, 78705 as managing conservator of the child. I have been informed of my parental rights, powers, duties and privileges. I freely, voluntarily, and permanently give and relinquish to the agency all my parental rights, privileges, powers and duties. I consent to the placement of the child for adoption by this agency.

I fully understand that a lawsuit will be promptly filed in the 126th District Court of Travis County, Texas, to terminate. forever the parent-child relationship between me and my child. Termination of the parent-child relationship between me and my child is in the best interest of the child. I understand that by executing this affidavit, I make this termination possible. With this in mind, I hereby declare that this affidavit of relinquishment of parental rights is and shall be final, permanent, and irrevocable. I FULLY UNDERSTAND THAT IF I CHANGE MY MIND AT ANY TIME, I CAN NEVER FORCE THE AGENCY TO DESTROY, REVOKE, OR RETURN THIS AFFIDAVIT AND THAT I CANNOT TAKE BACK OR UNDO THIS AFFIDAVIT IN ANY WAY.

It is in the best interest of my child that this be my last parental act and deed. Not wishing to appear or be cited in the termination suit, I hereby waive the right to issuance, service and return of all process in any suit to terminate the parent-child relationship between me and the child. I agree to termination of the parent-child relationship between ·the child and me without further notice to me. I FULLY UNDERSTAND THAT I WILL NOT BE INFORMED FURTHER ABOUT THIS SUIT.

5. If a child has no presumed father, a mother wishing to place her child for adoption must sign an "Affidavit of Status of Child" identifying the alleged father or stating that the alleged father is unknown. *See* Tex. Fam.Code Ann. § 161.105 (West Supp.2000). The legislature slightly modified section 161.105 in 1999, after this case arose. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 556, § 40, 1999 Tex. Gen. Laws 3058, 3069. The modification does not affect our determination of this case, and we cite the current code for convenience.

explain the word "irrevocable," she asked Corina if she knew what it meant. Corina replied that once the relinquishment is signed, it cannot be undone. Moore confirmed that meaning and also told Corina that once she signed the affidavit, she could not "take it back, undo it, or change it."

Corina gave birth to a son on April 24. Moore met with Corina at the hospital on April 26, and Corina signed a temporary foster-care request. Moore told Corina that she "would always be able to visit her baby" and that her baby would always know that Corina was his mother. Corina cried throughout the one-and-one-half-hour visit. Moore scheduled a subsequent meeting with Corina to complete the adoption process. The child was placed in foster care on April 27.[6]

On April 28, Corina and her parents visited Marywood. Before the meeting, Corina was not aware that she was to sign the relinquishment affidavit then and was undecided as to whether she wanted to sign it. During the two-hour meeting, Corina, her parents, and Moore read and discussed the relinquishment affidavit in detail. Eventually, Corina signed the affidavit. During the meeting, and before Corina signed the relinquishment affidavit, Moore told Corina that she would "always be that child's birth mother and that with her sharing plan that she had with the adoptive family that she would have an opportunity to be in that child's life forever"; that she would "always have a relationship with [the adoptive] family and with [her] child"; that requests she made of the adoptive family would be "respect[ed]"; that the baby would have "two mothers," "both of whom would have input into his life"; that Corina "would be able to see her son grow up"; and that the birth family would be like the child's extended family. Corina specifically asked

what the agency could do to guarantee that she would have continual, post-adoptive visits with the child. Moore responded by "assur[ing] her that ... the adoptive family has an adoption worker working with them and that they would encourage them to respect what she wished for in terms ... of sharing and visits. And during their ... face-to-face visit and even after that, they said that they would respect her wishes in ... having that sharing plan." Moore repeated to Corina that she would always be a part of the baby's life. According to Corina and her mother, these promises are what convinced Corina to sign the relinquishment affidavit; the promises were "the only reason she signed."

Before the April 28 meeting, Corina did not have a copy of the relinquishment affidavit and did not review it with her parents. Corina was crying when she signed the affidavit, but Moore testified that "it's very common to have tears." Moore asked Corina if signing the relinquishment affidavit "was what she wanted to do" and informed Corina that once she signed it, she "couldn't undo or take it back." Moore never told Corina that signing the relinquishment affidavit meant that she would "never have any legal rights to see [her] child." According to Corina, Moore told her that she would only be "giving up [her] guardianship of [the child]." Corina understood this to mean that she would not be the one "taking care of him and raising him." Corina was not aware and no one informed her that she could have signed a second foster-care agreement to allow herself more time to make the final decision. Moore was the only person who explained the relinquishment affidavit to Corina, and she never told Corina that she could seek legal counsel or another person's opinion.[7] Marywood never revealed

---

6. The child was placed with foster parents at that time, not the prospective adoptive parents.

7. Corina argues that in explaining these legal documents Marywood engaged in the unauthorized practice of law. We do not address this issue because it is unnecessary to this appeal. *See* Tex.R.App. P. 47.1.

to Corina that the relinquishment affidavit could nullify the sharing plan that she believed would allow her a continuing role in her child's life. It is significant that the relinquishment affidavit was never mentioned to Corina until after she and Marywood had devised a sharing plan satisfactory to her. From that point forward, all of Corina's actions and decisions were founded on her belief in and reliance on the sharing plan.

The following day, April 29, Corina asked to visit her child. The same day Marywood filed a petition to terminate Corina's parental rights. On May 1, Corina was allowed to visit her son for one hour at Marywood. Later that day, Corina called Marywood. Exactly what was said in that phone call is disputed. Moore claims that although Corina was crying, in emotional pain, and "having a hard time," Corina never indicated that she wanted to terminate the adoption process. Corina claims that she told Moore that she "wanted [her] baby back" and that she "changed [her] mind." She asked if there was anything she could do, including hiring an attorney. Moore responded that there was nothing that could be done. Corina's mother also called on the afternoon of May 1 and according to Moore, asked if they "could undo the papers" because her daughter was in so much pain. Moore told Corina's mother that the relinquishment was "irrevocable and that it is signed and that there is no way to undo the document." Moore stated that there was nothing "in her conversation with Corina's mother on May 1st that would [have led her] to believe that Corina wanted the baby back" and that the conversation was "about documents." Yet Moore testified at trial that had Marywood known before the child was placed with the adoptive

parents that Corina wanted to keep him, Marywood would have returned the child to Corina.

On May 12, an associate judge recommended termination of Corina's parental rights. *See* Tex. Fam.Code Ann. § 201.005(a) (West Supp.2000);[8] Travis (Tex.) Civ. Dist. Ct. Loc. R. 6.2(j). Although Corina had that day retained counsel to contest the termination and adoption, the termination occurred before she could intervene. In spite of the earlier conversations between Marywood, Corina, and Corina's mother, Marywood placed Corina's child with the prospective adoptive parents the day after the associate judge's decision. Corina immediately gave notice that she was appealing the associate judge's termination recommendation to the district court. *See* Tex. Fam.Code Ann. § 201.015 (West Supp.2000);[9] Travis (Tex.) Civ. Dist. Ct. Loc. R. 6.10. Even in the face of this clear and immediate assertion that Corina did not want to give up her child, Marywood continued its efforts to terminate Corina's parental rights.

On June 8, the district court conducted a *de novo* trial. *See* Tex. Fam.Code Ann. § 201.015; Travis (Tex.) Civ. Dist. Ct. Loc. R. 6.10. The court heard testimony about Corina's stable family situation and unquestioned character. The guardian *ad litem* appointed for the child recommended that termination would *not* be in the best interest of the child and testified that Corina would be a competent parent and the child would be well cared for. Although initially concerned about Corina's commitment to raising her child, after meeting with Corina the guardian concluded that Corina "impressed [him] as someone who had clearly thought about these things"

8. The legislature modified section 201.005 in 1999, after this case arose. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 1302, § 4, 1999 Tex. Gen. Laws 4448, 4449. The modification does not affect our determination of this case, and we cite the current code for convenience.

9. The legislature modified section 201.015 in 1999, after this case arose. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 1302, § 10, 1999 Tex. Gen. Laws 4448, 4450. The modification does not affect our determination of this case, and we cite the current code for convenience.

and wanted to be a mother. Other evidence showed Corina's ability to care for the child: the Velas were building an additional room on their home, had purchased a crib and other necessities, and had arranged health insurance for the child. Corina planned to continue with her schooling while living with her parents. They would all contribute to the child's care, and on days when the family could not provide care, Corina planned to enroll him in the same licensed day-care facility that her younger sister had attended. After hearing this testimony, the district court terminated Corina's parental rights and appointed Marywood managing conservator.

Corina brings this appeal, arguing that (1) there was not clear and convincing evidence that she knowingly and voluntarily executed the relinquishment affidavit, and in fact the evidence shows that she did *not* execute it voluntarily; and (2) there was not clear and convincing evidence that termination of Corina's parental rights was in the best interest of the child. Marywood also appeals, asserting that the district court erred in requiring it to prove by clear and convincing evidence that Corina knowingly and voluntarily executed the relinquishment affidavit.

## DISCUSSION

The district court filed findings of facts and conclusions of law.[10] We attach to findings of fact the same weight, force, and dignity that we attach to a jury's verdict upon jury questions. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Lawyers Sur. Corp. v. Larson*, 869 S.W.2d

649, 653 (Tex.App.—Austin 1994, writ denied). Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards used to review jury findings. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex.App.—Austin 1992, no writ). The appellate court is not bound by the district court's legal conclusions, but conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See id.* at 196. Incorrect conclusions will not require a reversal if the controlling findings of fact will support a correct legal theory. *See id.* Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *See id.*

## I. Burden of Proof at Trial

Marywood maintains that the findings of fact and conclusions of law reflect that the district court misplaced the burden of proof by stating that Marywood proved by clear and convincing evidence that Corina *voluntarily* executed the relinquishment affidavit.[11] Marywood states that it is not complaining of the district court's judgment but believes it is necessary to raise this issue to ensure the proper standard of appellate review.[12]

Marywood argues that, as the proponent of the affidavit, it should be required to show by clear and convincing evidence only that the affidavit was executed according to the terms of section 161.103 of the Family Code. *See* Tex. Fam.Code Ann. § 161.103 (West Supp.2000).[13] The burden

---

10. Two findings are pertinent to this appeal:
 6. Corina ... voluntarily executed [the relinquishment affidavit] in accordance with the provisions of the Texas [F]amily Code.
 ....
 8. Termination of the parent-child relationship between Corina ... and the child is in the best interest of the child.
 The district court concluded, *inter alia*, that "[t]he parent-child relationship between Corina ... and the child should be terminated."

11. In both the district court's "Decree of Termination of Parent–Child Relationship" and

"Findings of Fact and Conclusions of Law," the court states that the findings pertinent to this appeal were established by clear and convincing evidence.

12. Because Marywood does not seek to "alter the trial court's judgment," it was not required to file a notice of appeal. *See* Tex. R.App. P. 25.1(c).

13. Section 161.103 states, "An affidavit for voluntary relinquishment of parental rights must be: (1) signed after the birth of the child

would then shift to Corina to demonstrate by a preponderance of evidence that the affidavit was the result of fraud, misrepresentation, overreaching, or the like. Corina argues that Marywood must also establish by clear and convincing evidence that the affidavit was voluntarily executed.[14] We agree with Marywood.

■ Once the proponent of the affidavit has established by clear and convincing evidence that the affidavit was executed according to the terms of section 161.103 of the Family Code, "the affidavit may be set aside only upon proof, by a preponderance of the evidence, that the affidavit was executed as a result of coercion, duress, fraud, deception, undue influence or overreaching." *In re Bruno*, 974 S.W.2d 401, 405 (Tex.App.—San Antonio 1998, no pet.) (citing *Coleman v. Smallwood*, 800 S.W.2d 353, 356 (Tex.App.—El Paso 1990, no writ)); *see Terrell v. Chambers*, 630 S.W.2d 800, 802 (Tex.App.—Tyler 1982) ("burden of proof of facts tending to show fraud, misrepresentation, overreaching, or the like, is upon the party seeking to revoke the affidavit"), *writ ref'd n.r.e. per curiam*, 639 S.W.2d 451 (Tex.1982).

We will place the burden as did the *Bruno, Coleman,* and *Terrell* courts. We do so because the supreme court has indicated that the burden to show involuntariness is on the party opposing the affidavit. *See Brown v. McLennan County Children's Protective Servs.*, 627 S.W.2d 390, 394 (Tex.1982) (in writ of error appeal, mother had burden "to show that the irrevocable affidavit was obtained by fraud, misrepresentation or overreaching" in order to show necessity of reporter's record); *Catholic Charities of the Diocese of Galveston, Inc. v. Harper*, 161 Tex. 21, 337 S.W.2d 111, 115 (1960) (parent's consent to place child for adoption "subject to revocation only by proof of fraud, misrepresentation, overreaching and the like").

■ We hold that Marywood was required to prove by clear and convincing evidence that Corina "executed before ·or after the suit [was] filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided in [section 161.103 of the Family Code]." Tex. Fam. Code Ann. § 161.001 (West Supp.2000).[15] To set aside the affidavit, Corina had the burden to prove by a preponderance of the evidence that the relinquishment affidavit was executed as a result of some nature of wrongdoing, such as coercion, duress, misrepresentation, fraud, deception, undue influence, or overreaching. *See Harper*, 337 S.W.2d at 115; *Bruno*, 974 S.W.2d at 405. We sustain Marywood's issue.

## II. Termination of Parental Rights

■ The Family Code provides that the

---

... (2) witnessed by two credible persons; and (3) verified before a person authorized to take oaths." Tex. Fam.Code Ann. § 161.103 (West Supp.2000). Corina does not argue that the relinquishment affidavit does not comply with section 161.103 other than that the affidavit was not executed voluntarily.

14. In support of her argument, Corina relies on *Neal v. Texas Department of Human Services*, 814 S.W.2d 216, 223 (Tex.App.—San Antonio 1991, writ denied) (Chapa, J., concurring). The *Neal* concurrence would require that the proponent of the affidavit bring forth clear and convincing evidence that the affidavit was in fact executed voluntarily. *See Neal*, 814 S.W.2d at 223 (Chapa, J., concurring). In a subsequent case, the Fourth Court of Appeals, without comment on the *Neal* concurrence, has failed to follow Justice Cha-

pa's approach. *See In re Bruno*, 974 S.W.2d 401, 405 (Tex.App.—San Antonio 1998, no pet.). Corina also directs us to *B.A.L. v. Edna Gladney Home*, 677 S.W.2d 826 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.), and *Methodist Mission Home v. N.A.B.*, 451 S.W.2d 539 (Tex.Civ.App.—San Antonio 1970, no writ). These cases, however, do not support the proposition that the proponent of a relinquishment affidavit must prove by clear and convincing evidence that the execution of the affidavit was voluntary.

15. The legislature modified section 161.001 in 1999, after this case arose. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 1087, § 1, 1999 Tex. Gen. Laws 3947. The modification does not affect our determination of this case, and we cite the current code for convenience.

court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: (1) that the parent has: ... (K) executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided in this chapter; ... *and* (2) that termination is in the best interest of the child.

Tex. Fam.Code Ann. § 161.001 (emphasis added). "This provision requires proof of both elements; the proof of the first does not excuse proof of the second." *Byrne v. Catholic Charities, Diocese of San Angelo, Inc.,* 710 S.W.2d 780, 782 (Tex.App.—Austin 1986, no writ) (construing similar statute and citing *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Wiley v. Spratlan,* 543 S.W.2d 349, 351 (Tex.1976); *Terrell,* 630 S.W.2d at 803).

 The natural right existing between parents and their children is one of constitutional dimension. *See Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980). Involuntary termination of parental rights involves fundamental constitutional rights. *See Holick,* 685 S.W.2d at 18; *G.M.,* 596 S.W.2d at 846. This natural parental right has been characterized as "essential," "a basic civil right," and "far more precious than property rights." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1976); *see Holick,* 685 S.W.2d at 18. A termination decree is complete, final, irrevocable and divests for all time that natural right as well as all legal rights (except for the child's right to inherit). *See Holick,* 685 S.W.2d at 18. Termination proceedings must be strictly scrutinized, and termination statutes are strictly construed in favor of the parent. *See id.* This oft-chanted mantra emphasizes that we must exercise the utmost care in reviewing the termination of parental rights to be certain that the child's interests are best served and that the parent's rights are acknowledged and protected.

## A. Whether the Relinquishment Affidavit was Executed Voluntarily

 It is undisputed that Marywood proved by clear and convincing evidence that the relinquishment affidavit was executed in conformity with section 161.001 of the Family Code. However, in her first issue, Corina argues that "no rational trier of fact could find ... that the Affidavit of Relinquishment was executed voluntarily and knowingly, rather than as the result of misrepresentation, fraud, overreaching, and coercion." The Family Code implicitly recognizes that an affidavit of relinquishment must be executed voluntarily. *See* Tex. Fam.Code Ann. § 161.103; *Neal v. Texas Dep't of Human Servs.,* 814 S.W.2d 216, 218 (Tex.App.—San Antonio 1991, writ denied). Since an affidavit of relinquishment waives rights of constitutional magnitude, *see G.M.,* 596 S.W.2d at 846–47, it must be made voluntarily, knowingly, intelligently, and with full awareness of the legal consequences. "[A]n involuntarily executed affidavit is a complete defense to a termination suit or decree based solely upon a finding under section [161.001(1)(K) ] of the Family Code." *Neal,* 814 S.W.2d at 219.

### 1. *Standard of Review*

 We have held that Corina must carry the burden of proving that she did not voluntarily execute the relinquishment affidavit. *See supra* pp. 11–14. Thus, Corina attacks the legal sufficiency of an adverse finding to an issue on which she had the burden of proof. To carry her burden, she must demonstrate on appeal "that the evidence conclusively established all vital facts in support of the issue." *Smith v. Central Freight Lines, Inc.,* 774 S.W.2d 411, 412 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *see also* W. Wendell Hall, *Standards of Review in Texas,* 29 St. Mary's L.J. 351, 481–82 (1998). "A party attempting to overcome an adverse fact finding must surmount two hurdles. First, the record must be examined for evidence that supports the ... finding, while ignoring all evidence to the contrary.

Second, if there is no evidence to support the fact finder's answer, then, the entire record must be examined to see if the contrary proposition is established as a matter of law." *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *see Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991) (quoting *Sterner,* 767 S.W.2d at 690); *see also* Hall, *supra,* at 482.

### 2. *Marywood's Duty to Corina*

Corina argues that Marywood affirmatively misrepresented to her facts that induced her to sign the relinquishment affidavit. Specifically, Corina claims that the only reason she signed the relinquishment affidavit was that Marywood led her to believe that she had the right and would continue to play a significant role in her child's life after the adoption, would continue to have contact with her child, and was only giving up guardianship of her child. At the time they were made, these representations were either false or misleading because Marywood knew that Corina would have no legal right to enforce the sharing plan against the adoptive parents. And, because Marywood was in a close relationship with Corina as her counselor, it had a duty to fully disclose that the open-adoption arrangement had no legal effect. Corina also emphasizes that she was never given a copy of the relinquishment affidavit to bring home with her; Marywood never suggested she seek legal advice; and Moore was the only person who ever explained the relinquishment affidavit to her. Thus, Corina insists that she did not voluntarily and knowingly execute the relinquishment affidavit and that she signed only as the result of coercion, misrepresentation, fraud, and overreaching.

 In general, coercion is "[c]ompulsion by physical force or threat," or "the improper use of economic power." Black's Law Dictionary 106 (7th ed.1999). Misrepresentation is a falsehood or untruth with the intent and purpose to deceive. *See Great S. Life Ins. Co. v. Doyle,* 136 Tex. 377, 151 S.W.2d 197, 201 (1941). In the context of fraud, courts have stated that misrepresentation is making a false statement of fact or a false expression of opinion by one claiming or implying special knowledge. *See, e.g., Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). Silence can constitute a misrepresentation: "When the particular circumstances impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation." *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986); *see also Fisher Controls Int'l, Inc. v. Gibbons,* 911 S.W.2d 135, 140 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

 Fraud "is an elusive and shadowy term which has been defined in some cases as any cunning or artifice used to cheat or deceive another." *Santanna Natural Gas Corp. v. Hamon Operating Co.,* 954 S.W.2d 885, 890 (Tex.App.—Austin 1997, pet. denied); *see First State Bank v. Fatheree,* 847 S.W.2d 391, 395–96 (Tex. App.—Amarillo 1993, writ denied). Fraud may consist of both active misrepresentation and passive silence. *See American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 435–37 (Tex.1997); *Santanna Natural Gas,* 954 S.W.2d at 890. At common law, the word "fraud" refers to an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage. *See Russell v. Industrial Transp. Co.,* 113 Tex. 441, 258 S.W. 462, 462 (1924); *Chien v. Chen,* 759 S.W.2d 484, 494 (Tex.App.—Austin 1988, no writ). The "legal duty" may arise from several sources. *See Chien,* 759 S.W.2d at 494 n. 6. For example, this "legal duty" may exist if it is established that one has placed special confidence in another where the latter is bound, in equity and good conscience, to act in good faith and with due regard for the interests of the other; it can arise when special confidence is placed in someone thereby giving that person a

position of superiority and influence. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962); *Schiller v. Elick,* 150 Tex. 363, 240 S.W.2d 997, 1000 (1951); *Chien,* 759 S.W.2d at 494 n. 6. In general, once a party undertakes to speak, that party assumes a duty to tell the whole truth. *See Santanna Natural Gas,* 954 S.W.2d at 891 (citing *International Sec. Life Ins. Co. v. Finck,* 475 S.W.2d 363, 370 (Tex.Civ. App.—Amarillo 1971), *rev'd in part on other grounds,* 496 S.W.2d 544 (Tex.1973)). Common-law fraud includes both "actual" and "constructive fraud." *See Chien,* 759 S.W.2d at 494–95. Actual fraud includes intentional breaches of duty that are designed to injure another or to obtain an undue and unconscientious advantage, and constructive fraud encompasses those breaches that the law condemns as "fraudulent" merely because they tend to deceive others, violate confidences, or cause injury to public interest, regardless of the actor's intentions. *See Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964); *Chien,* 759 S.W.2d at 494–95. A false representation of a past or present material fact, when one has a duty to speak the truth, is a frequent ground for recovery in fraud when another relies on the representation to her detriment, even in an ordinary arms-length transaction where only the ethics of the marketplace apply. *See Chien,* 759 S.W.2d at 495 (citing *Jeffcoat v. Phillips,* 534 S.W.2d 168 (Tex.Civ.App.— Houston [14th Dist.] 1976, writ ref'd n.r.e.)).

 Overreaching is "tricking, outwitting, or cheating a person into doing an act which he would not otherwise have done." *B.A.L. v. Edna Gladney Home,* 677 S.W.2d 826, 831 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). Overreaching is generally synonymous with fraud. *See Browning v. Nesting,* 219 S.W.2d 712, 718 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.).

 Marywood, by its own admission, is more than an adoption agency. It provides extensive parental-counseling services and advertises these services to the public. Moore testified that she is given the discretion to counsel "openly, objectively, and honestly." Corina, in seeking counseling from Marywood, was reasonably entitled to rely fully and unconditionally on Marywood's representations. We hold that Marywood owed Corina a duty of complete disclosure when discussing adoption procedures, including any proposed post-adoption plan. Complete disclosure encompassed the obligation to tell Corina the entire truth about the ramifications of the sharing plan she had chosen with Marywood's help and to make her fully aware that it lacked legally binding effect. Marywood's duty springs from two sources. First, when Marywood made a partial disclosure to Corina about the post-adoption plan, it assumed the duty to tell the whole truth. *See Santanna Natural Gas,* 954 S.W.2d at 891. Second, the evidence conclusively establishes that Corina placed special confidence in Moore, who by virtue of the counseling relationship occupied a position of superiority and influence on behalf of Marywood; thus, Moore and Marywood became bound, in equity and good conscience, to act in good faith and with due regard to Corina's interests. *See Chien,* 759 S.W.2d at 494 n. 6. This Court has recognized that a "higher obligation is owed to certain groups because of their vulnerabilities." *Porter v. Nemir,* 900 S.W.2d 376, 386 (Tex.App.—Austin 1995, no writ). A young unmarried mother considering placement of her child for adoption is clearly vulnerable and is owed that "higher obligation" when she confides in a maternity counselor.

### 3. Whether There Is Any Evidence that Corina Voluntarily Signed the Relinquishment Affidavit

 To determine whether Corina has met her burden of conclusively proving that she did not sign the relinquishment affidavit voluntarily, we must first ascertain if the record contains any evidence to support the district court's finding to the

contrary. *See Sterner*, 767 S.W.2d at 690. Marywood argues that it discharged any duty it owed Corina and that there is ample evidence that Corina fully understood the relinquishment affidavit and wanted to proceed with the adoption. Marywood points out that Moore read and explained the relinquishment affidavit to Corina on three separate occasions;[16] that Corina and her mother both testified that Corina fully understood the relinquishment affidavit when she signed it; that the relinquishment affidavit itself says it was voluntary;[17] and that after Marywood discussed with Corina her option to parent, Corina still wanted to place the child for adoption.

Although the face of the affidavit reflects it was signed knowingly and voluntarily, we must consider the surrounding circumstances to determine if Corina's signature on the document was procured by misrepresentation, fraud, or the like. *See, e.g., Bruno*, 974 S.W.2d at 405–06; *Coleman*, 800 S.W.2d at 356–57; *B.A.L.*, 677 S.W.2d at 829–31 (all looking to surrounding circumstances to determine if relinquishment affidavit was signed knowingly and voluntarily). Corina neither signed nor understood the relinquishment affidavit in a vacuum. She signed and understood it in the context of and in reliance on the post-adoption plan that she and Marywood created, a plan that Marywood now admits is an "empty promise." The evidence conclusively establishes that Corina wanted to proceed with the adoption *only* if she could have post-adoption visits with her child; there is no evidence to the contrary.

Marywood submits that the record shows that Corina understood the post-adoption plan and that if anyone breached the plan, it was Corina.[18] Marywood states that it "did not make any guarantees about the [post-adoption] plan." Instead, Marywood merely told Corina that her wishes for post-adoption visits would be "respected" and that Marywood would "'encourage' the adoptive parents to follow through with the planned relationship with [Corina]."

There is no evidence in the record, however, that Corina was ever told that the post-adoption plan could not be legally enforced. Marywood's words to Corina were at worst deceptive and at best vague. According to Moore, Corina asked her during the April 28 signing of the relinquishment affidavit what Marywood could do to guarantee continual, post-adoptive visits with her child. Moore responded by "assur[ing]" her that ... the adoptive family has an adoption worker working with them and that they would encourage them to respect what she wished for in terms of ... sharing and visits. And during their ... face-to-face visit and even after that, they said that they would respect her wishes in ... having that sharing plan." Marywood was obligated to answer Corina's question directly and tell her that the agency could not guarantee post-adoption visits. Instead, in counseling Corina, Moore carefully selected her words and minced her explanation of the sharing plan with the result that Corina understood one thing while Moore meant another. Wheth-

16. Moore's testimony indicates that Moore read and explained the relinquishment affidavit to Corina on *two* occasions—the day Corina signed the affidavit and during the meeting immediately preceding her child's birth. The third time we assume Marywood is referring to was the March 30 meeting when Moore testified that she did not discuss the affidavit with Corina but merely "showed her the form."

17. *See supra* note 4.

18. Marywood states that "a second visit [between Corina and her son] was scheduled and

[Corina] did not show up." The record indicates that the second visit was in fact a meeting during which Marywood would physically hand over the child to the adoptive parents. Corina was invited but had already decided at that point to contest the adoption. She testified that she did not go to the meeting because it would simply have been too difficult for her. In any event, breach is irrelevant since Corina was not a party and had no legal basis to enforce the agreement between Marywood and the prospective adoptive parents.

er the incomplete disclosure was deliberate or inadvertent, it does not satisfy the duty of full disclosure that Marywood owed Corina.

Marywood also points to the testimony of Corina herself:

Q: [to Corina]: So when you left [the agency after you signed the relinquishment affidavit], was there ... anything that you told the agency that would have led them to believe that there was anything wrong with the adoption process?

A: No, sir, not when I left.

Q: Okay. And there was no doubt in your mind that you signed an irrevocable document?

A: No, sir.

Q: And are you—you are not telling this Court that you were coerced into signing it?

A: No, sir.

Q: Or defrauded into signing it?

A: No, sir.

Q: Or threatened in any manner?

A: No, sir.

Marywood takes this testimony out of context. Corina was not threatened, coerced, or defrauded into *physically signing* the relinquishment affidavit. At the time she signed the affidavit, Corina did not know that the post-adoption plan was unenforceable and thus had no reason to believe that she would not have access to her child. Corina's testimony cannot be considered evidence that the affidavit was signed knowingly and voluntarily because she was testifying about her state of mind *before* she knew that the post-adoption plan was unenforceable.

Finally, Marywood urges that there is no evidence in the record that indicates Marywood had any kind of incentive to push Corina toward adoption. Marywood's motivation is not relevant to the issue of whether Corina signed the relinquishment affidavit knowingly and voluntarily.

We hold that there is no evidence of probative value that supports the district court's finding that Corina voluntarily executed the relinquishment affidavit. Corina has surmounted the first *Sterner* hurdle. *See Sterner,* 767 S.W.2d at 690.

**4. Whether Corina Established as a Matter of Law that the Relinquishment Affidavit was Wrongfully Procured**

■ We turn our attention now to *Sterner's* second hurdle: Has Corina established as a matter of law that the relinquishment affidavit was procured by fraud, coercion, overreaching, or misrepresentation? *See id.*

We find no evidence in the record that Corina was compelled by force or threat to sign the relinquishment affidavit. We overrule Corina's issue to the extent that it complains that the affidavit was procured by coercion.

However, we find conclusive evidence in the record that the relinquishment affidavit was wrongfully procured. Considering only Marywood's version of events, we conclude as a matter of law that its statements and omissions to Corina constituted misrepresentation, fraud, or overreaching. Marywood admits that it told Corina that "with her sharing plan ... she would have an opportunity to be in that child's life forever"; that she would "always have a relationship with [the adoptive] family and with [her] child"; that requests she made of the adoptive family would be "respect[ed]"; that the baby would have "two mothers," "both of whom would have input into his life"; and that Corina "would be able to see her son grow up." Marywood never told Corina that she would not have any legal right to see her child after she signed the relinquishment affidavit, and even when Corina directly asked if Marywood could guarantee post-adoption visits, Marywood failed to give her a complete answer. Marywood's statements are misleading and stop short of complete disclosure. They are half-truths that would lead a reasonable person in Corina's circum-

stance to believe that she had a continuing right to see her child according to the terms of the sharing plan. Corina advised Moore on March 25 of her desire to have a post-adoptive role in her child's life. The relinquishment affidavit was not mentioned before March 30. From March 25 forward, and throughout all discussions of the relinquishment affidavit, Corina was justified in relying on the sharing plan in deciding to place her child for adoption. It is undisputed that Corina sought counseling from Marywood to aid her in the difficult decision of whether to keep her child. She was a young woman faced with a life-changing situation. She found comfort in and placed reliance on Marywood's counseling. We need not and do not determine whether Marywood deliberately misled Corina. At a minimum, Marywood's advice and counsel was incomplete. We hold that Corina conclusively established that the relinquishment affidavit was procured by misrepresentation, fraud, or overreaching and therefore was not voluntarily signed. We sustain Corina's first issue and hold that the relinquishment affidavit is void as a matter of law.[19]

## B. Best Interest of the Child

Because we have determined that the relinquishment affidavit is void, it is not necessary to decide Corina's second issue, whether there was clear and convincing evidence that termination of her parental rights was in the best interest of the child. *See* Tex. Fam.Code Ann. § 161.001 (requiring relinquishment affidavit *and* finding that it is in child's best interest to terminate before court can terminate parental rights). We note, however, that without the affidavit, there is scant evidence in the record as to the child's best

interest. *See Terrell*, 630 S.W.2d at 802–03.

In arguing that there is additional evidence that termination would be in the child's best interest, Marywood directs us to statements made by Corina and her mother well in advance of the birth of the child as to Corina's motivation in seeking Marywood's counseling and pursuing the adoption process. Moore testified that *at the time of trial*, it would be in the child's best interest to remain with the prospective adoptive parents. However, she also testified that *prior to actual placement*, it would have been in the child's best interest to be returned to Corina. Marywood asserts that while Corina can provide a home where she, her parents, and a babysitter would jointly care for the child, the adoptive parents can provide a two-parent family with the father staying home and acting as full-time caregiver. Marywood's program director testified that it would be in the child's best interest to remain with the prospective adoptive parents *since the child has been adjusting to that home.* The guardian *ad litem*, however, concluded that it was *not* in the child's best interest to terminate Corina's parental rights, that Corina is competent, and that Corina would properly care for the child. Moore herself testified that she knows of no reason why Corina "could not properly take care of the physical and emotional needs" of the baby. We are mindful that the effect of this decision may now work a hardship not only on the child but also upon the prospective adoptive parents. We observe, however, that although Marywood knew soon after Corina signed the affidavit that she had reconsidered her decision, Marywood nevertheless proceed-

---

**19.** Corina asserts that the appellate court applies "a higher standard of review" when examining a trial-court record for clear and convincing evidence to support the findings of the trier of fact. Because we have held that it was Corina's burden to prove by a preponderance of the evidence that the relinquishment affidavit was not executed voluntarily, *see supra* pp. 11–14, we express no opinion on this

assertion. Further, in considering Corina's issues in the light of that burden, we have presumed that she has brought forward attacks on both the legal and factual sufficiency of the evidence to support the district court's findings. Because we have held that the evidence is legally insufficient to support those findings, we do not address factual insufficiency. *See* Tex.R.App. P. 47.1.

ed with termination and placement; we further note that at the time of trial the child had been with the prospective adoptive parents for less than a month.

There is no evidence that Corina is an unfit mother or is financially or emotionally unable to care for the needs of her son.

## CONCLUSION

In conclusion, we hold that once a child-placing agency undertakes to counsel an expectant mother with regard to her alternatives upon the birth of her child, the agency must provide her with complete information regarding those alternatives. It may not leave the mother to speculate on the consequences of the action upon which she and the agency have agreed. In this particular case, our decision is made difficult because the child is now two years of age and has spent almost his entire life with the prospective adoptive parents. However, any fault lies with the pace of the legal system and not with the mother.

Because we hold that the evidence conclusively establishes that Corina did not voluntarily sign the relinquishment affidavit, we reverse the district court's judgment and render judgment in favor of Corina that her parental rights are not terminated.[20]