TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00030-CV






Robin Cash Lumbis, Appellant



v.



Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. FM0-00570, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING






 Appellant Robin Cash Lumbis appeals from the district court's termination of her
parental rights to her two children. She contends that the evidence is legally insufficient to support
the court's findings that she voluntarily executed an affidavit of relinquishment, that the evidence
is legally and factually insufficient to support the finding that termination was in the children's best
interest, and that she received ineffective assistance of counsel. We will affirm.


Factual background

 Lumbis has twin sons, J.C.L. and A.M.L. On January 8, 2000, appellee Texas
Department of Protective and Regulatory Services ("the Department") received a referral alleging
the "neglectful supervision" of the boys, who were six years old at the time. Lumbis had been
arrested on January 6 for assaulting Alfred Lumbis, her husband and the boys' father. Upon her
arrest, Lumbis left her sons with a friend, but the friend could not keep the children until Lumbis's
release and "wanted someone to do something about the children now." The referral alleged that
Lumbis used and sold drugs and had a history of domestic violence. The referral also alleged that
Lumbis had two other sons, one who was raised by his grandmother and another who was living with
his father, and that A.M.L. and J.C.L. "defecate in their pants" and "appear to know a lot about sex
in general and oral sex." 

 A Department case worker visited Lumbis on January 12 at the Travis County
Correctional Complex. Lumbis told the case worker that her husband Alfred had sexually assaulted
her and that she defended herself with a baseball bat and then took the boys with her to a shelter. 
She said she was trying to file a protective order against Alfred when she was arrested. Before
January 6, Lumbis had been arrested about seven times, dating back to early 1996, for offenses
including possession of cocaine, violation of a protective order, assault, and forgery.

 On January 12, the friend who was caring for the boys told the case worker that she
had been caring for the children since January 6 and could no longer care for them. She said Lumbis
was in denial about her alcohol and drug abuse, the children frequently missed school, and Lumbis
and Alfred were irresponsible. The case worker interviewed Alfred, who said he did not know where
his sons were and he had not tried to find them. Alfred said he had hepatitis C, could not work, and
was going to live with his mother. Alfred saw Lumbis use cocaine as recently as January 1. Alfred
admitted he had recently used cocaine himself and said he drinks beer and uses cocaine and
marijuana on a weekly basis. Alfred said he could not care for A.M.L. and J.C.L. Alfred also had
a number of prior arrests, including arrests for assault, harassment, and family violence. Finally, the
case worker spoke to Lumbis's mother, who said that she had not had frequent contact with Lumbis
and that Lumbis and Alfred were drug addicts. Lumbis's mother said that initially after completing
a drug treatment program, Lumbis was a good mother, but once she re-established contact with
Alfred, she began using drugs again and stopped caring for the children. Lumbis's mother refused
to take the boys unless she had legal custody. The Department placed the children into foster care.

 The district court ordered Lumbis to undergo therapy, submit to weekly urinalysis,
attend parenting classes, and attend weekly Alcoholics Anonymous or Narcotics Anonymous
meetings. The court ordered that Lumbis could visit her sons once a week. Alfred was ordered to
undergo a psychiatric evaluation, submit to urinalysis, attend AA or NA meetings, and maintain
stable housing. Alfred was prohibited from having any contact with the boys. In late June, the
Department moved to suspend Lumbis's visitations with her sons because J.C.L. made a second
outcry of abuse and because the children's therapist recommended it. On June 30, the district court
suspended Lumbis's visits with her sons.

 On October 23, the district court terminated Lumbis's and Alfred's parental rights,
finding that Lumbis and Alfred had executed irrevocable affidavits relinquishing their parental rights
and that termination was in the best interest of A.M.L. and J.C.L. The termination order recited that
the Department agreed to (1) provide Alfred and Lumbis with "semi-annual written updates" on the
children until they were adopted, (2) give Lumbis semi-annual photographs of the children until they
were adopted, (3) give Lumbis information regarding the Adoption Registry, (4) allow Lumbis,
Alfred, and the boys' grandmothers to write letters to be placed in the boys' life books, (5) allow
Lumbis to have a two-hour goodbye visit with each boy, (6) allow Lumbis to give the children gifts
at the goodbye visits, (7) send Lumbis's attorney quarterly updates until the children were adopted,
and (8) inform Lumbis when the children were adopted. In mid-November, Toya Lutz, Lumbis's
attorney, filed a motion to withdraw from the case, stating she and Lumbis had a conflict of interest. 
Lutz's motion was granted and a new attorney was appointed.

 On November 21, acting through her new attorney, Lumbis filed a motion for new
trial, alleging the affidavit of relinquishment was obtained by coercion, duress, fraud, deception,
undue influence, or overreaching. Lumbis alleged Lutz misrepresented the facts to induce Lumbis
to sign the affidavit. Lumbis alleged that she only signed the affidavit because she believed "that
she had the right and would continue to play a role in her children's lives after the adoption regarding
the construction of a life book, mutual correspondence, exchange of photographs, and if the adoptive
parents agreed, some type of future contact." Lumbis alleged the representations were false or
misleading because the Department knew Lumbis would have no legal right to enforce the agreement
against the adoptive parents. Lumbis also alleged she was "so emotionally upset" when she signed
the affidavit that she did not appreciate the consequences. Finally, she alleged she was threatened
with criminal action if she did not sign. 

 At the hearing on Lumbis's motion, Lumbis testified that she was thirty-nine years
old, has her GED, and has completed 117 hours of college education. She also said she has
undergone intensive drug therapy, in spite of having one relapse in September 2000, and has gotten
involved in working with the Battered Women's Shelter and AA programs. Lumbis testified that
Lutz first mentioned the affidavit of relinquishment on October 17, three days before Lumbis signed. 
Lumbis said during the time frame including October 17 through October 20, she was being treated
for mild bipolar disorder and anxiety attacks and was taking medication for depression, anxiety,
insomnia, and emotional turmoil. Lumbis testified that she told Lutz that she "was not in a good
state of mind to understand and comprehend what was going on" and that she felt she was being
forced to sign the affidavit. Lumbis testified that she understood that if she signed the affidavit, the
Department would allow her to correspond with the children and that she "possibly might be able
to work something out with the adoptive parents to be a part of [her] children's lives." Lumbis also
said Lutz told her that if the case went to trial, Lumbis "could be charged with things" arising out
of alleged abuse of the children. Lumbis said Lutz never told her that if the adoptive parents refused
to participate in an open adoption, Lumbis had no legal means to enforce her agreement with the
Department against the parents. Lumbis said that if Lutz had explained that there was no legal
means to enforce the agreement, she would not have signed. She testified that she thought signing
the affidavit would "buy some more time" and that she could then continue to fight to regain custody
of the children. Lumbis said she did not understand the finality of the affidavit and "was too much
in a state of shock and disarray, confused." Lumbis also testified that she did not believe termination
was in the children's best interest. Lumbis believed she was misled into signing the affidavit
because she was not in the right frame of mind to sign such a life-altering document.

 The affidavit is four pages long and contains the following paragraph:


I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT UNTIL I HAVE
READ AND UNDERSTOOD EACH WORD, SENTENCE, AND PARAGRAPH
IN IT. I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT OF
RELINQUISHMENT IF THERE IS ANY THOUGHT IN MY MIND THAT I
MIGHT SOMEDAY SEEK TO CHANGE MY MIND. I REALIZE THAT I
SHOULD NOT SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF I AM NOT
THINKING CLEARLY BECAUSE OF ILLNESS, MEDICATION, MY
EMOTIONAL STATE, OR ANY OTHER REASON. BECAUSE I REALIZE HOW
IMPORTANT THIS DECISION IS FOR THE FUTURE OF MY CHILDREN, I
HAVE PUT MY INITIALS BESIDE EVERY LINE OF THIS PARAGRAPH SO
THAT IT WILL ALWAYS BE UNDERSTOOD THAT I HAVE READ THIS
AFFIDAVIT OF RELINQUISHMENT, UNDERSTAND IT, AND DESIRE TO
SIGN IT.



Lumbis initialed next to each line of that paragraph. The affidavit also states: 



I FULLY UNDERSTAND THAT, IF I CHANGE MY MIND AT ANY
TIME, I CAN NEVER FORCE THE TEXAS DEPARTMENT OF
PROTECTIVE AND REGULATORY SERVICES TO DESTROY,
REVOKE, OR RETURN THIS AFFIDAVIT AND THAT I CANNOT
TAKE BACK OR UNDO THIS AFFIDAVIT IN ANY WAY.



Lumbis said she did not remember each line of the admonishment beside which she initialed. She
remembered hearing that she should not sign if she was not thinking clearly due to medication or her
emotional state. Asked, "Now, you have changed your mind," Lumbis answered, "No, ma'am. I
did not understand that day the finality of it. I thought that I could still fight for my children to come
home. I thought that their dad was going to be out of the picture and that until my kids came home
that I might be able to have some kind of contact." When asked what her concept of an open
adoption was on the day she signed the affidavit, Lumbis said, "[T]here was going to be a life book
for my children and the adoptive parents and . . . every three months I would hear something about
my children. And that I thought that if I represented myself well in the life book that surely the
parents would feel comfortable with me playing an active role in their lives." She said, "I didn't
contemplate on [an open adoption] much because I didn't see that as an option. My kids were
coming home." Lumbis said she was told she "might have an opportunity to be a part of" the
children's lives, and said the risk that she might not have such an opportunity "did not occur" to her.

 Lutz testified that she was appointed to represent Lumbis in late January or early
February 2000. She said she spoke to Lumbis at least once a day from October 17 through October
20 and met with Lumbis for about three hours on October 20. Lutz read through the affidavit with
Lumbis, explaining it as they went along. Lutz said she explained that signing the affidavit meant
Lumbis would give up her parental rights to the boys. Lutz testified that she explained what
"irrevocable" meant and Lumbis seemed to understand the definition. Lutz testified that she told
Lumbis the Department would try to arrange an open adoption, meaning the adoptive family had the
choice to allow Lumbis contact with the children. Lutz said she also told Lumbis that the adoptive
parents did not have to allow such contact. She told Lumbis that she would be able to write letters
for a life book, but did not tell Lumbis that there could be mutual correspondence or an exchange
of photographs. Lutz understood that post-adoption correspondence from the children would be up
to the adoptive parents. Lutz did not tell Lumbis that the Department would do anything beyond the
agreements set out in the termination order. Lutz testified that Lumbis was concerned that criminal
charges could be brought if she did not sign and that those concerns might have contributed to her
decision to sign the affidavit. Lutz denied threatening Lumbis with criminal charges if she did not
sign, but said she and Lumbis discussed the possibility that a criminal investigation could arise if the
case went to trial. Although Lumbis was emotional and crying at the time she signed the affidavit,
she never told Lutz she felt forced into signing and Lutz did not believe Lumbis was so emotional
that she did not know what she was doing. Lutz said Lumbis never said she was not signing the
affidavit freely and voluntarily. Lutz said she did not mislead Lumbis into signing and said she
explained that Lumbis could not enforce an open adoption in a court of law.

 The district court denied Lumbis's motion for a new trial, finding Lumbis had not
carried her burden of showing the affidavit was not voluntary. The court noted Lumbis's age and
education and observed that the affidavit made it very clear that by signing the affidavit Lumbis gave
up her parental rights and could not revoke the relinquishment. The district court stated:


But finally, I want to turn to a very important piece of evidence. And that's the
affidavit that you signed, not under Ms. Lutz's guidance, but under [Lumbis's newly
appointed attorney's] guidance and that you signed on November 21 to support your
motion for new trial. And it said, "I was led to believe that I had the right and would
continue to play a role in my boys' life after the adoption, and if the adoptive parents
agreed, some type of future contact." So you swore under oath that you knew that an
open adoption hinged on the adoptive parents' agreement. And so my point about
an open adoption is that while you and your lawyer had some kind of talk about an
open adoption--and it's not clear exactly what kind--your lawyer clearly told you
that it couldn't be enforced. And you have sworn under oath that you understood it
couldn't be enforced because it was contingent upon the adoptive parent's agreement
because you had no enforceable right to an open adoption. It couldn't possibly have
been an inducement to you to enter into or to sign the affidavit. It couldn't be an
inducement because you knew you didn't have an enforceable right. At best you
knew it was a possibility.


The district court found that neither the Department nor Lutz misled or coerced Lumbis, that Lutz
explained there was no guarantee of an open adoption, and that Lumbis knew she would have no say
in her children's lives once she signed the affidavit. The court stated that even if Lumbis was
swayed to sign the affidavit by her concerns about potential criminal charges, it did not render her
act involuntary. Finally, the district court noted that "[i]t's always upsetting to relinquish parental
rights. That doesn't mean that your emotions took away your power of reason and that your
relinquishment wasn't voluntarily [sic]."


Did Lumbis voluntarily sign the affidavit of relinquishment?

 In her first issue on appeal, Lumbis contends that the evidence is legally insufficient
to support a finding that she executed the affidavit of relinquishment voluntarily.

 An irrevocable affidavit relinquishing a parent's rights and a petition for termination
can support a finding that termination is in the best interest of the child and a judgment of
termination. Brown v. McLennan County Children's Protective Servs., 627 S.W.2d 390, 394 (Tex.
1982); In re Bruno, 974 S.W.2d 401, 405 (Tex. App.--San Antonio 1998, no pet.). Once it is
established by clear and convincing evidence that the affidavit was properly executed, the affidavit
may only be set aside upon a finding, by the preponderance of the evidence, that it was procured by
coercion, duress, fraud, deception, undue influence, or overreaching. Vela v. Marywood, 17 S.W.3d
750, 758 (Tex. App.--Austin 2000), pet. denied, 53 S.W.3d 684 (Tex. 2001); In re Bruno, 974
S.W.2d at 405; see Tex. Fam. Code Ann. §§ 161.001(1)(K), .103 (West Supp. 2002). Termination
proceedings are subject to strict scrutiny, and termination statutes are strictly construed in favor of
the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); Vela, 17 S.W.3d at 759.

 Lumbis seeks to rely on this Court's recent decision in Vela v. Marywood, in which
a young, unwed mother signed an irrevocable affidavit of relinquishment. Vela, 17 S.W.3d at 753-55. We held the affidavit was involuntarily procured by misrepresentation, fraud, or overreaching
because the adoption agency had a special duty to the birth mother but never told her that the open
adoption "sharing plan" they discussed with her could not be enforced legally. Id. at 760-64. 
Instead, the agency told the birth mother that the sharing plan would allow her to be a part of her
child's life forever, leading her to believe she was only giving up guardianship of the child. Id. at
755, 763. The birth mother was not represented by an attorney during the termination process. Id.
at 755. The facts in Vela differ significantly from the facts in the cause at hand.

 The Department told Lumbis it would try to arrange an open adoption whereby
Lumbis might be able to have post-adoption contact if the adoptive parents so agreed. That Lumbis
believed she would be able to convince the adoptive parents to allow her to maintain contact does
not render her decision involuntary. Lumbis was represented by counsel throughout the process. 
She understood the meaning of "irrevocable," and discussed the relinquishment extensively with
her attorney before she signed it. Lumbis was not misled into believing that she was guaranteed
post-adoption contact, as was the case in Vela. See id. Everything in the affidavit and termination
order concerning any continuing contact with the children relates only to contact up to the time of
their adoption, not after. There is no evidence that Lumbis was guaranteed an open adoption or that
the adoptive family would comply with Lumbis's wishes to stay in contact with her children. On
the contrary, Lumbis admitted she knew any post-adoption contact would depend on the adoptive
parents' consent.

 Lumbis signed the affidavit knowing she was relinquishing her parental rights and
knowing her actions were irrevocable. See In re Bruno, 974 S.W.2d at 402-03, 405-06 (although
mother signed irrevocable affidavit while emotionally upset and afraid of parents' reaction, signature
was voluntary); Coleman v. Smallwood, 800 S.W.2d 353, 355-57 (Tex. App.--El Paso 1990, no
writ). We do not doubt that Lumbis may have been emotionally upset when she signed the affidavit. 
However, that does not render the affidavit involuntary. The district court heard the witnesses and
evaluated their credibility and the weight to be given their testimony. We will not second guess its
determination on such issues. See Terrell v. Chambers, 630 S.W.2d 800, 802 (Tex. App.--Tyler),
writ ref'd n.r.e., 639 S.W.2d 451 (Tex. 1982). Lumbis has not carried her burden of showing the
affidavit was procured by fraud, misrepresentation, overreaching, or the like, and we cannot hold that
the district court erred in finding that Lumbis signed the affidavit voluntarily. In re Bruno, 974
S.W.2d 405-06; Coleman, 800 S.W.2d at 355-57. We overrule her first issue on appeal.


Was termination in the best interest of the children?

 In her second and third issues, Lumbis contends there was legally and factually
insufficient evidence to support the finding that termination was in the children's best interest.

 The affidavit Lumbis signed states that "[i]t is in the best interest of the children that
the children be placed for adoption." The Department case worker testified that termination was in
the boys' best interest, and the boys' attorney/guardian ad litem filed a report asking the district court
to follow the case worker's recommendations. (1) There is no evidence that termination is not in the
children's best interest. We conclude there is sufficient evidence to support the finding that
termination is in the children's best interest. We overrule Lumbis's second and third issues.


Did Lumbis receive ineffective assistance of counsel?

 Finally, in her fourth issue on appeal, Lumbis contends she received ineffective
assistance of counsel.

 We have previously held that parents in a termination case are not entitled to the same
constitutional guarantee of effective counsel afforded to criminal defendants. Arteaga v. Texas Dep't
of Protective & Regulatory Servs., 924 S.W.2d 756, 762 (Tex. App.--Austin 1996, writ denied); see
also In re B.B., 971 S.W.2d 160, 172 (Tex. App.--Beaumont 1998, pet. denied); In re J.F., 888
S.W.2d 140, 143 (Tex. App.--Tyler 1994, no writ); Posner v. Dallas County Child Welfare Unit of
Tex. Dep't of Human Servs., 784 S.W.2d 585, 588 (Tex. App.--Eastland 1990, writ denied). Even
if we assume Lumbis was entitled to the constitional guarantee of effective counsel, see In re B.L.D.,
56 S.W.3d 203, 211-12 (Tex. App.--Waco 2001, no pet.); In re J.M.S., 43 S.W.3d 60, 62-63 (Tex.
App.--Houston [1st Dist.] 2001, no pet.), she has not shown Lutz's representation was ineffective. 
When challenging the effectiveness of counsel, a criminal defendant bears the heavy burden of
showing that (1) her attorney's performance was so deficient and contained such serious errors that
the attorney did not function as counsel, and (2) the deficient performance prejudiced her defense. 
Strickland v. Washington, 466 U.S. 668, 687 (1984).

 Here, Lumbis contends that Lutz did not clearly explain the consequences of an open
adoption agreement. She argues that had she known such an agreement was not legally enforceable,
she would not have signed the affidavit. However, she admits that before she signed, Lutz told her
"that the Department did not have to find a family who would participate in an 'open adoption.'"

 Further, Lutz testified she told Lumbis that she could not enforce an open adoption
in a court of law. Lutz testified she explained the affidavit to Lumbis, who periodically asked for
further explanation. Lutz told Lumbis that the Department would try to arrange an open adoption,
but that the adoptive parents did not have to allow post-adoption contact. Although Lumbis denied
being told that she could not legally enforce the agreement, she also said she knew she could have
post-adoption visits with the boys "if the adoptive parents consented." (Emphasis added.) Lumbis
has not shown she did not know the consequences of relinquishment or open adoption. She has not
shown that Lutz's performance was so deficient that Lutz did not function as counsel or that any
deficient performance prejudiced Lumbis's case. Strickland, 466 U.S. at 687. We overrule
Lumbis's fourth issue on appeal and we affirm the district court's decree of termination.



 

 David Puryear, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: January 25, 2002

Publish

1. Furthermore, an affidavit of relinquishment, in and of itself, can provide sufficient evidence that
termination is in the child's best interest. Stubbs v. Stubbs, 685 S.W.2d 643, 645-46 (Tex. 1985);
Brown, 627 S.W.2d at 394; Ivy v. Edna Gladney Home, 783 S.W.2d 829, 833 (Tex. App.--Fort
Worth 1990, no writ).