# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00030-CV

**Robin Cash Lumbis, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. FM0-00570, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

Appellant Robin Cash Lumbis appeals from the district court's termination of her parental rights to her two children. She contends that the evidence is legally insufficient to support the court's findings that she voluntarily executed an affidavit of relinquishment, that the evidence is legally and factually insufficient to support the finding that termination was in the children's best interest, and that she received ineffective assistance of counsel. We will affirm.

### Factual background

Lumbis has twin sons, J.C.L. and A.M.L. On January 8, 2000, appellee Texas Department of Protective and Regulatory Services ("the Department") received a referral alleging the "neglectful supervision" of the boys, who were six years old at the time. Lumbis had been arrested on January 6 for assaulting Alfred Lumbis, her husband and the boys' father. Upon her arrest, Lumbis left her sons with a friend, but the friend could not keep the children until Lumbis's

release and "wanted someone to do something about the children now." The referral alleged that Lumbis used and sold drugs and had a history of domestic violence. The referral also alleged that Lumbis had two other sons, one who was raised by his grandmother and another who was living with his father, and that A.M.L. and J.C.L. "defecate in their pants" and "appear to know a lot about sex in general and oral sex."

A Department case worker visited Lumbis on January 12 at the Travis County Correctional Complex. Lumbis told the case worker that her husband Alfred had sexually assaulted her and that she defended herself with a baseball bat and then took the boys with her to a shelter. She said she was trying to file a protective order against Alfred when she was arrested. Before January 6, Lumbis had been arrested about seven times, dating back to early 1996, for offenses including possession of cocaine, violation of a protective order, assault, and forgery.

On January 12, the friend who was caring for the boys told the case worker that she had been caring for the children since January 6 and could no longer care for them. She said Lumbis was in denial about her alcohol and drug abuse, the children frequently missed school, and Lumbis and Alfred were irresponsible. The case worker interviewed Alfred, who said he did not know where his sons were and he had not tried to find them. Alfred said he had hepatitis C, could not work, and was going to live with his mother. Alfred saw Lumbis use cocaine as recently as January 1. Alfred admitted he had recently used cocaine himself and said he drinks beer and uses cocaine and marijuana on a weekly basis. Alfred said he could not care for A.M.L. and J.C.L. Alfred also had a number of prior arrests, including arrests for assault, harassment, and family violence. Finally, the case worker spoke to Lumbis's mother, who said that she had not had frequent contact with Lumbis and that

2

Lumbis and Alfred were drug addicts. Lumbis's mother said that initially after completing a drug treatment program, Lumbis was a good mother, but once she re-established contact with Alfred, she began using drugs again and stopped caring for the children. Lumbis's mother refused to take the boys unless she had legal custody. The Department placed the children into foster care.

The district court ordered Lumbis to undergo therapy, submit to weekly urinalysis, attend parenting classes, and attend weekly Alcoholics Anonymous or Narcotics Anonymous meetings. The court ordered that Lumbis could visit her sons once a week. Alfred was ordered to undergo a psychiatric evaluation, submit to urinalysis, attend AA or NA meetings, and maintain stable housing. Alfred was prohibited from having any contact with the boys. In late June, the Department moved to suspend Lumbis's visitations with her sons because J.C.L. made a second outcry of abuse and because the children's therapist recommended it. On June 30, the district court suspended Lumbis's visits with her sons.

On October 23, the district court terminated Lumbis's and Alfred's parental rights, finding that Lumbis and Alfred had executed irrevocable affidavits relinquishing their parental rights and that termination was in the best interest of A.M.L. and J.C.L. The termination order recited that the Department agreed to (1) provide Alfred and Lumbis with "semi-annual written updates" on the children until they were adopted, (2) give Lumbis semi-annual photographs of the children until they were adopted, (3) give Lumbis information regarding the Adoption Registry, (4) allow Lumbis, Alfred, and the boys' grandmothers to write letters to be placed in the boys' life books, (5) allow Lumbis to have a two-hour goodbye visit with each boy, (6) allow Lumbis to give the children gifts at the goodbye visits, (7) send Lumbis's attorney quarterly updates until the children were adopted,

3

and (8) inform Lumbis when the children were adopted. In mid-November, Toya Lutz, Lumbis's attorney, filed a motion to withdraw from the case, stating she and Lumbis had a conflict of interest. Lutz's motion was granted and a new attorney was appointed.

On November 21, acting through her new attorney, Lumbis filed a motion for new trial, alleging the affidavit of relinquishment was obtained by coercion, duress, fraud, deception, undue influence, or overreaching. Lumbis alleged Lutz misrepresented the facts to induce Lumbis to sign the affidavit. Lumbis alleged that she only signed the affidavit because she believed "that she had the right and would continue to play a role in her children's lives after the adoption regarding the construction of a life book, mutual correspondence, exchange of photographs, and if the adoptive parents agreed, some type of future contact." Lumbis alleged the representations were false or misleading because the Department knew Lumbis would have no legal right to enforce the agreement against the adoptive parents. Lumbis also alleged she was "so emotionally upset" when she signed the affidavit that she did not appreciate the consequences. Finally, she alleged she was threatened with criminal action if she did not sign.

At the hearing on Lumbis's motion, Lumbis testified that she was thirty-nine years old, has her GED, and has completed 117 hours of college education. She also said she has undergone intensive drug therapy, in spite of having one relapse in September 2000, and has gotten involved in working with the Battered Women's Shelter and AA programs. Lumbis testified that Lutz first mentioned the affidavit of relinquishment on October 17, three days before Lumbis signed. Lumbis said during the time frame including October 17 through October 20, she was being treated for mild bipolar disorder and anxiety attacks and was taking medication for depression, anxiety, insomnia, and

4

emotional turmoil. Lumbis testified that she told Lutz that she "was not in a good state of mind to understand and comprehend what was going on" and that she felt she was being forced to sign the affidavit. Lumbis testified that she understood that if she signed the affidavit, the Department would allow her to correspond with the children and that she "possibly might be able to work something out with the adoptive parents to be a part of [her] children's lives." Lumbis also said Lutz told her that if the case went to trial, Lumbis "could be charged with things" arising out of alleged abuse of the children. Lumbis said Lutz never told her that if the adoptive parents refused to participate in an open adoption, Lumbis had no legal means to enforce her agreement with the Department against the parents. Lumbis said that if Lutz had explained that there was no legal means to enforce the agreement, she would not have signed. She testified that she thought signing the affidavit would "buy some more time" and that she could then continue to fight to regain custody of the children. Lumbis said she did not understand the finality of the affidavit and "was too much in a state of shock and disarray, confused." Lumbis also testified that she did not believe termination was in the children's best interest. Lumbis believed she was misled into signing the affidavit because she was not in the right frame of mind to sign such a life-altering document.

The affidavit is four pages long and contains the following paragraph:

> I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT UNTIL I HAVE READ AND UNDERSTOOD EACH WORD, SENTENCE, AND PARAGRAPH IN IT. I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF THERE IS ANY THOUGHT IN MY MIND THAT I MIGHT SOMEDAY SEEK TO CHANGE MY MIND. I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF I AM NOT THINKING CLEARLY BECAUSE OF ILLNESS, MEDICATION, MY EMOTIONAL STATE, OR ANY OTHER REASON. BECAUSE I REALIZE HOW IMPORTANT THIS DECISION IS FOR THE FUTURE OF MY

CHILDREN, I HAVE PUT MY INITIALS BESIDE EVERY LINE OF THIS PARAGRAPH SO THAT IT WILL ALWAYS BE UNDERSTOOD THAT I HAVE READ THIS AFFIDAVIT OF RELINQUISHMENT, UNDERSTAND IT, AND DESIRE TO SIGN IT.

Lumbis initialed next to each line of that paragraph. The affidavit also states:

I FULLY UNDERSTAND THAT, IF I CHANGE MY MIND AT ANY TIME, I CAN NEVER FORCE THE TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES TO DESTROY, REVOKE, OR RETURN THIS AFFIDAVIT AND THAT I CANNOT TAKE BACK OR UNDO THIS AFFIDAVIT IN ANY WAY.

Lumbis said she did not remember each line of the admonishment beside which she initialed. She remembered hearing that she should not sign if she was not thinking clearly due to medication or her emotional state. Asked, "Now, you have changed your mind," Lumbis answered, "No, ma'am. I did not understand that day the finality of it. I thought that I could still fight for my children to come home. I thought that their dad was going to be out of the picture and that until my kids came home that I might be able to have some kind of contact." When asked what her concept of an open adoption was on the day she signed the affidavit, Lumbis said, "[T]here was going to be a life book for my children and the adoptive parents and . . . every three months I would hear something about my children. And that I thought that if I represented myself well in the life book that surely the parents would feel comfortable with me playing an active role in their lives." She said, "I didn't contemplate on [an open adoption] much because I didn't see that as an option. My kids were coming home." Lumbis said she was told she "might have an opportunity to be a part of" the children's lives, and said the risk that she might not have such an opportunity "did not occur" to her.

6

Lutz testified that she was appointed to represent Lumbis in late January or early February 2000. She said she spoke to Lumbis at least once a day from October 17 through October 20 and met with Lumbis for about three hours on October 20. Lutz read through the affidavit with Lumbis, explaining it as they went along. Lutz said she explained that signing the affidavit meant Lumbis would give up her parental rights to the boys. Lutz testified that she explained what "irrevocable" meant and Lumbis seemed to understand the definition. Lutz testified that she told Lumbis the Department would try to arrange an open adoption, meaning the adoptive family had the choice to allow Lumbis contact with the children. Lutz said she also told Lumbis that the adoptive parents did not have to allow such contact. She told Lumbis that she would be able to write letters for a life book, but did not tell Lumbis that there could be mutual correspondence or an exchange of photographs. Lutz understood that post-adoption correspondence from the children would be up to the adoptive parents. Lutz did not tell Lumbis that the Department would do anything beyond the agreements set out in the termination order. Lutz testified that Lumbis was concerned that criminal charges could be brought if she did not sign and that those concerns might have contributed to her decision to sign the affidavit. Lutz denied threatening Lumbis with criminal charges if she did not sign, but said she and Lumbis discussed the possibility that a criminal investigation could arise if the case went to trial. Although Lumbis was emotional and crying at the time she signed the affidavit, she never told Lutz she felt forced into signing and Lutz did not believe Lumbis was so emotional that she did not know what she was doing. Lutz said Lumbis never said she was not signing the affidavit freely and voluntarily. Lutz said she did not mislead Lumbis into signing and said she explained that Lumbis could not enforce an open adoption in a court of law.

The district court denied Lumbis's motion for a new trial, finding Lumbis had not carried her burden of showing the affidavit was not voluntary. The court noted Lumbis's age and education and observed that the affidavit made it very clear that by signing the affidavit Lumbis gave up her parental rights and could not revoke the relinquishment. The district court stated:

> But finally, I want to turn to a very important piece of evidence. And that's the affidavit that you signed, not under Ms. Lutz's guidance, but under [Lumbis's newly appointed attorney's] guidance and that you signed on November 21 to support your motion for new trial. And it said, "I was led to believe that I had the right and would continue to play a role in my boys' life after the adoption, and if the adoptive parents agreed, some type of future contact." So you swore under oath that you knew that an open adoption hinged on the adoptive parents' agreement. And so my point about an open adoption is that while you and your lawyer had some kind of talk about an open adoption—and it's not clear exactly what kind—your lawyer clearly told you that it couldn't be enforced. And you have sworn under oath that you understood it couldn't be enforced because it was contingent upon the adoptive parent's agreement because you had no enforceable right to an open adoption. It couldn't possibly have been an inducement to you to enter into or to sign the affidavit. It couldn't be an inducement because you knew you didn't have an enforceable right. At best you knew it was a possibility.

The district court found that neither the Department nor Lutz misled or coerced Lumbis, that Lutz explained there was no guarantee of an open adoption, and that Lumbis knew she would have no say in her children's lives once she signed the affidavit. The court stated that even if Lumbis was swayed to sign the affidavit by her concerns about potential criminal charges, it did not render her act involuntary. Finally, the district court noted that "[i]t's always upsetting to relinquish parental rights. That doesn't mean that your emotions took away your power of reason and that your relinquishment wasn't voluntarily [sic]."

**Did Lumbis voluntarily sign the affidavit of relinquishment?**

In her first issue on appeal, Lumbis contends that the evidence is legally insufficient to support a finding that she executed the affidavit of relinquishment voluntarily.

An irrevocable affidavit relinquishing a parent's rights and a petition for termination can support a finding that termination is in the best interest of the child and a judgment of termination. *Brown v. McLennan County Children's Protective Servs.*, 627 S.W.2d 390, 394 (Tex. 1982); *In re Bruno*, 974 S.W.2d 401, 405 (Tex. App.—San Antonio 1998, no pet.). Once it is established by clear and convincing evidence that the affidavit was properly executed, the affidavit may only be set aside upon a finding, by the preponderance of the evidence, that it was procured by coercion, duress, fraud, deception, undue influence, or overreaching. *Vela v. Marywood*, 17 S.W.3d 750, 758 (Tex. App.—Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001); *In re Bruno*, 974 S.W.2d at 405; *see* Tex. Fam Code Ann. §§ 161.001(1)(K), .103 (West Supp. 2002). Termination proceedings are subject to strict scrutiny, and termination statutes are strictly construed in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *Vela*, 17 S.W.3d at 759.

Lumbis seeks to rely on this Court's recent decision in *Vela v. Marywood*, in which a young, unwed mother signed an irrevocable affidavit of relinquishment. *Vela*, 17 S.W.3d at 753-55. We held the affidavit was involuntarily procured by misrepresentation, fraud, or overreaching because the adoption agency had a special duty to the birth mother but never told her that the open adoption "sharing plan" they discussed with her could not be enforced legally. *Id.* at 760-64. Instead, the agency told the birth mother that the sharing plan *would* allow her to be a part of her child's life forever, leading her to believe she was only giving up guardianship of the child. *Id.* at 755, 763. The

birth mother was not represented by an attorney during the termination process. *Id*. at 755. The facts in *Vela* differ significantly from the facts in the cause at hand.

The Department told Lumbis it would *try* to arrange an open adoption whereby Lumbis *might* be able to have post-adoption contact *if* the adoptive parents so agreed. That Lumbis believed she would be able to convince the adoptive parents to allow her to maintain contact does not render her decision involuntary. Lumbis was represented by counsel throughout the process. She understood the meaning of "irrevocable," and discussed the relinquishment extensively with her attorney before she signed it. Lumbis was not misled into believing that she was guaranteed post-adoption contact, as was the case in *Vela*. *See id.* Everything in the affidavit and termination order concerning any continuing contact with the children relates only to contact up to the time of their adoption, not after. There is no evidence that Lumbis was guaranteed an open adoption or that the adoptive family would comply with Lumbis's wishes to stay in contact with her children. On the contrary, Lumbis admitted she knew any post-adoption contact would depend on the adoptive parents' consent.

Lumbis signed the affidavit knowing she was relinquishing her parental rights and knowing her actions were irrevocable. *See In re Bruno*, 974 S.W.2d at 402-03, 405-06 (although mother signed irrevocable affidavit while emotionally upset and afraid of parents' reaction, signature was voluntary); *Coleman v. Smallwood*, 800 S.W.2d 353, 355-57 (Tex. App.—El Paso 1990, no writ). We do not doubt that Lumbis may have been emotionally upset when she signed the affidavit. However, that does not render the affidavit involuntary. The district court heard the witnesses and evaluated their credibility and the weight to be given their testimony. We will not second guess its

10

determination on such issues. *See Terrell v. Chambers*, 630 S.W.2d 800, 802 (Tex. App.—Tyler), *writ ref'd n.r.e.*, 639 S.W.2d 451 (Tex. 1982). Lumbis has not carried her burden of showing the affidavit was procured by fraud, misrepresentation, overreaching, or the like, and we cannot hold that the district court erred in finding that Lumbis signed the affidavit voluntarily. *In re Bruno*, 974 S.W.2d 405-06; *Coleman*, 800 S.W.2d at 355-57. We overrule her first issue on appeal.

## Was termination in the best interest of the children?

In her second and third issues, Lumbis contends there was legally and factually insufficient evidence to support the finding that termination was in the children's best interest.

The affidavit Lumbis signed states that "[i]t is in the best interest of the children that the children be placed for adoption." The Department case worker testified that termination was in the boys' best interest, and the boys' attorney/guardian ad litem filed a report asking the district court to follow the case worker's recommendations.[1] There is no evidence that termination is not in the children's best interest. We conclude there is sufficient evidence to support the finding that termination is in the children's best interest. We overrule Lumbis's second and third issues.

## Did Lumbis receive ineffective assistance of counsel?

Finally, in her fourth issue on appeal, Lumbis contends she received ineffective assistance of counsel.

---

[1] Furthermore, an affidavit of relinquishment, in and of itself, can provide sufficient evidence that termination is in the child's best interest. *Stubbs v. Stubbs*, 685 S.W.2d 643, 645-46 (Tex. 1985); *Brown*, 627 S.W.2d at 394; *Ivy v. Edna Gladney Home*, 783 S.W.2d 829, 833 (Tex. App.—Fort Worth 1990, no writ).

We have previously held that parents in a termination case are not entitled to the same constitutional guarantee of effective counsel afforded to criminal defendants. *Arteaga v. Texas Dep't of Protective & Regulatory Servs.*, 924 S.W.2d 756, 762 (Tex. App.—Austin 1996, writ denied); *see also In re B.B.*, 971 S.W.2d 160, 172 (Tex. App.—Beaumont 1998, pet. denied); *In re J.F.*, 888 S.W.2d 140, 143 (Tex. App.—Tyler 1994, no writ); *Posner v. Dallas County Child Welfare Unit of Tex. Dep't of Human Servs.*, 784 S.W.2d 585, 588 (Tex. App.—Eastland 1990, writ denied). Even if we assume Lumbis was entitled to the constitional guarantee of effective counsel, *see In re B.L.D.*, 56 S.W.3d 203, 211-12 (Tex. App.—Waco 2001, no pet.); *In re J.M.S.*, 43 S.W.3d 60, 62-63 (Tex. App.—Houston [1st Dist.] 2001, no pet.), she has not shown Lutz's representation was ineffective. When challenging the effectiveness of counsel, a criminal defendant bears the heavy burden of showing that (1) her attorney's performance was so deficient and contained such serious errors that the attorney did not function as counsel, and (2) the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Here, Lumbis contends that Lutz did not clearly explain the consequences of an open adoption agreement. She argues that had she known such an agreement was not legally enforceable, she would not have signed the affidavit. However, she admits that before she signed, Lutz told her "that the Department did not have to find a family who would participate in an 'open adoption.'"

Further, Lutz testified she told Lumbis that she could not enforce an open adoption in a court of law. Lutz testified she explained the affidavit to Lumbis, who periodically asked for further explanation. Lutz told Lumbis that the Department would try to arrange an open adoption, but that the adoptive parents did not have to allow post-adoption contact. Although Lumbis denied

12

being told that she could not legally enforce the agreement, she also said she knew she could have post-adoption visits with the boys "*if* the adoptive parents consented." (Emphasis added.) Lumbis has not shown she did not know the consequences of relinquishment or open adoption. She has not shown that Lutz's performance was so deficient that Lutz did not function as counsel or that any deficient performance prejudiced Lumbis's case. *Strickland*, 466 U.S. at 687. We overrule Lumbis's fourth issue on appeal and we affirm the district court's decree of termination.

_

David Puryear, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed:   January 25, 2002

Publish