NO. 12-03-00351-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


IN RE H.M., J.C.S.
§
 APPEAL FROM THE 307TH


AND I.R.S.,
§
 JUDICIAL DISTRICT COURT OF


MINOR CHILDREN
§
 GREGG COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellant Tamara Simon ("Tamara") appeals the termination of her parental rights. In her
sole issue, Tamara argues that the evidence is factually insufficient to support the trial court's finding
that termination is in the best interest of the children. We affirm.


Background

 Tamara is the parent of three minor children, H.M. born on July 3, 1998, J.C.S. born on May
7, 2001, and I.R.S. born on March 27, 2003. Charles Kevin Morgan ("Morgan") is the father of
H.M. and the alleged father of I.R.S. Ed Mumphrey ("Mumphrey") is the alleged father of J.C.S.
Tamekia Fredricks ("Fredricks") testified that, in June of 2002, she was an investigator with Child
Protective Services ("CPS") in Gregg County, Texas. Between June 8, 2002 and June 20, 2002, CPS
received five or six intake calls concerning Tamara and her children, H.M. and J.C.S. Allegations
included that Tamara was on drugs and inadequately supervising or properly caring for her children;
that H.M. was playing outside after midnight and wandering the neighborhood; that the children
were very dirty and had soiled diapers and bug bites over their bodies; that J.C.S. had problems
breathing; that J.C.S. was covered with red welts; that Tamara did not have a stable home; that H.M.
was observed running through a truck stop where Tamara allegedly prostituted; and that, when
Tamara visited a hospital after a wreck, her blood alcohol level was extremely high and she tested
positive for marijuana, cocaine, and opiates.

 On June 20, 2002, Fredricks located Tamara at her mother's residence. At that time,
Fredricks observed that H.M. and J.C.S. suffered from bug bites and were dirty, but appeared
healthy. H.M. was very "rambunctious," and ran through the house when Fredricks attempted to
interview her. According to Fredricks, H.M.'s behavior was "extraordinary." Morgan and Tamara
denied another intake allegation that H.M. had been dancing provocatively and touching her vaginal
area. Although Tamara was aware that J.C.S. suffered asthma, his breathing machine was broken
and Tamara had never tried to get it repaired. Fredricks was not able to determine that Tamara had
any source of income or any financial resources to provide for the children's needs. Further, Tamara
denied specific prostitution allegations and minimized her drug use. At that time, Fredricks did not
know Tamara was pregnant. Although Fredricks had received a significant number of intakes
regarding the children, Tamara's attitude during their meeting was "nonchalant." Nonetheless,
Tamara voluntarily agreed to place her children with her mother, Kathy Hoskins ("Kathy").
Fredricks's findings were neglectful supervision and medical neglect. However, she was unable to
determine if there was physical neglect. Although Kathy initially agreed to keep the children, she
and her husband, Robert, subsequently decided that they could not care for the children.

 The Texas Department of Protective and Regulatory Services (the "Department") filed an
original petition for protection of H.M. and J.C.S., for conservatorship, and for termination of the
parent-child relationship on June 25, 2002. After I.R.S.'s birth, the Department filed an amended
original petition adding I.R.S. to the suit. On October 6, 2003, the trial court ordered termination
of the parent-child relationship between Morgan and H.M., between Mumphrey and J.C.S., and
between Morgan and I.R.S. On October 13, 2003, Tamara's termination proceeding was tried before
a jury. After hearing and examining all of the evidence, the jury found by clear and convincing
evidence that the parent-child relationship between Tamara and H.M., J.C.S., and I.R.S. should be
terminated. On October 14, 2003, the trial court ordered termination of the parent-child relationship
between Tamara and H.M., J.C.S., and I.R.S. This appeal followed.


Termination of Parental Rights

 Involuntary termination of parental rights embodies fundamental constitutional rights. Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.-Austin 2000), pet. denied per curiam, 53 S.W.3d 684
(Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.-Texarkana 1995, writ denied). Because
a termination action is complete, final, and irrevocable, the proceedings must be strictly scrutinized.
Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw, 966 S.W.2d 174, 179 (Tex.
App.-El Paso 1998, no pet.).

 Section 161.001 of the Family Code permits a court to order termination of parental rights
if two elements are established. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.M.T., 39
S.W.3d 234, 237 (Tex. App.-Waco 1999, no pet.), disapproved on other grounds, 96 S.W.3d 256,
267 & n.39 (Tex. 2002). First, the parent must have engaged in any one of the acts or omissions
itemized in the first subsection of the statute. Tex. Fam. Code Ann. § 161.001(1) (Vernon 2002);
Green v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 213, 219 (Tex. App.-El Paso
2000, no pet.); In re J.M.T., 39 S.W.3d at 237. Second, termination must be in the best interest of
the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon 2002); In re J.M.T., 39 S.W.3d at 237. 
Additionally, both elements must be established by clear and convincing evidence, and proof of one
element does not alleviate the petitioner's burden of proving the other. Tex. Fam. Code Ann.
§161.001; Wiley, 543 S.W.2d at 351; In re J.M.T., 39 S.W.3d at 237. There is a strong presumption
that the best interest of the child is served by preserving the parent-child relationship. Wiley, 543
S.W.2d at 352; In re J.M.T., 39 S.W.3d at 240. Thus, the burden of proof is upon the person
seeking to deprive the parent of their parental rights. In re J.M.T., 39 S.W.3d at 240.


Best Interest of the Child

 On appeal, Tamara challenges the trial court's finding that termination is in the children's
best interest. In determining the best interest of the child, a number of factors have been considered
including (1) the desires of the child; (2) the emotional and physical needs of the child now and in
the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental
abilities of the individuals seeking custody; (5) the programs available to assist these individuals;
(6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions
of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72
(Tex. 1976).

 This list is not exhaustive, but simply indicates considerations which have been or could be
pertinent. Id. However, the best interest of the child does not require proof of any unique set of
factors nor limit proof to any specific factors. In re D.M., 58 S.W.3d 801, 814 (Tex. App.-Fort
Worth 2001, no pet.). The Holley test focuses on the best interest of the child, not the parent's best
interest. Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex.
App.-Dallas 1995, no writ).


Factual Sufficiency of the Evidence

 In her sole issue, Tamara contends that the evidence is factually insufficient to support the
trial court's finding.

Standard of Review

 Due process requires a petitioner to justify termination by clear and convincing evidence
because termination is such a drastic remedy. In re J.M.T., 39 S.W.3d at 237. The clear and
convincing standard for termination of parental rights is both constitutionally and statutorily
mandated. Tex. Fam. Code Ann. § 161.001; In re J.J., 911 S.W.2d at 439. Clear and convincing
evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code
Ann. § 101.007 (Vernon 2002). 

 Because termination findings must be based on clear and convincing evidence, the standard
of review is not the same on appeal as a finding based upon a preponderance of the evidence. In re
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). The appropriate standard for reviewing a factual
sufficiency challenge to the termination findings is whether the evidence is such that a fact finder
could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. In
re C.H., 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard,
we consider all the evidence in the record, both that in support of and contrary to the trial court's
findings. Id. at 27-29. Further, we must consider whether disputed evidence is such that a
reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. In
re J.F.C., 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not
reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id. 
Analysis

 The record shows that, in September of 2002, Tamara tested positive for morphine, opiates,
and cocaine and her primary drug was crack cocaine. Tamara attended drug rehabilitation at
Kirkpatrick Family Center ("Kirkpatrick") in Longview from September 16, 2002 to January 11,
2003. Sandra McLaughlin ("McLaughlin"), a licensed chemical dependency counselor and program
manager at Kirkpatrick, testified that Tamara was at Kirkpatrick for four months, performed a visible
turn-around, stayed in contact with the center, and attended Friday night meetings. According to
Bertile Johnson ("Johnson"), a CPS caseworker in Gregg County, Texas, Tamara initially complied
with CPS's service plan and her provider's recommendations. After I.R.S. was born in March 2003,
there were no allegations or proof that I.R.S. or Tamara tested positive for drugs. Tamara admitted
that she did not complete all of CPS's service plan, but did finish a "whole lot." Tamara admitted
that one of Kirkpatrick's recommendations was to attend Alcoholics Anonymous ("AA") and
Narcotics Anonymous ("NA"). Although Tamara stated that she went to two AA meetings, she did
not attend these meetings until after a positive drug test in September 2003.

 On September 2, 2003, Johnson conducted a home visit, but was also there to investigate an
intake alleging that Tamara was abusing prescription medications. Tamara appeared to be under the
influence, but denied "using." Tamara stated that she had been prescribed hydrocodone for pain. 
The following day, Tamara tested positive for benzodiazapine, Darvocet, and Xanax, a "street" drug. 
According to Dwayne Cox ("Cox"), a licensed chemical dependency counselor, hydrocodone and
Xanax are drugs of abuse. If Tamara was taking these drugs in September of 2003, then she would
have relapsed.

 Tamara testified that, since H.M.'s birth, she had lived on and off with her mother, father,
and boyfriends. Tamara maintained appropriate housing from August to October 1, 2003. However,
in October of 2003, Tamara was evicted from her apartment. To Johnson's knowledge, Tamara has
never established a residence for the children. At the time of trial, she was living with her
grandmother. Although Tamara obtained a job in May, she was terminated in July and has not
obtained any other employment.

 According to Johnson, H.M. had many behavioral problems. She was very wild, screamed,
yelled, had difficulty being in public places, demonstrated aggressive behavior toward other children,
including hitting, and also demonstrated destructive behavior at the foster home, including
destroying toys and items. When she arrived at the foster home, H.M. was "like a wild animal." She
lacked any social skills, would run from her foster mother in public, did not know her "borders," and
sexually acted out. Further, H.M. did not know how to interact with other children in her foster
home, did not have proper table manners, and did not know how to take care of her personal hygiene.
Her foster mother, Delores McNair ("McNair"), found H.M. performing oral sex on a four-year-old
boy in her house. H.M. said that she saw her mother doing it. According to Donald Winstead
("Winstead"), a licensed psychologist, if a child is acting out sexually with sexually explicit
behavior, he is certain that the child has had some exposure to adult sexuality. H.M.'s behaviors
necessitated therapy with Kelly Smith ("Smith"), a licensed professional counselor. H.M. was
diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). In her therapy, Smith
discovered that H.M. was very bossy, directive, limit-testing, and manipulative. H.M. was also
sexually acting out and had problems with an eating disorder. In fact, when she played with dolls,
H.M. would have them simulate sex. Smith believes H.M. had observed sexual activity between
adults and was mimicking that behavior.

 Smith stated that H.M. has shown steady improvement in therapy. According to McNair, the
change in H.M.'s behavior has been dramatic and she has not seen H.M. act out sexually in months.
All three children are physically healthy although both H.M. and J.C.S. were behind on their
immunizations when removed from Tamara. J.C.S. suffered from problems relating to his asthma
because he had not received some treatment. Tamara denied that J.C.S. failed to get treatments
because his nebulizer was broken. 

 When her children were taken away in 2002, Tamara admitted that she was wild and
probably not a very good mother. When Tamara used drugs, Kathy had the children "a whole lot."
According to Winstead, Tamara had an elevated score on the Child Abuse Potential Inventory,
meaning that she is at greater risk of abusing her children. According to Smith, Tamara was lacking
in parental ability and there seemed to be a reversal of roles between Tamara and H.M. While
Tamara's parental ability has improved, there is still some work that needs to be done. Virginia Hunt
("Hunt"), a supervisor of conservatorship for CPS, found that Tamara had a lifestyle of chronic
instability as a mother. Hunt reported that Tamara had a history of drug use, domestic violence with
Morgan, no stable job history or transportation, and past history with CPS. 

 Tamara believes she can "probably [be] real successful" in staying away from drugs in the
future. According to Tamara, she wants to finish her G.E.D. In six months, hopefully, she will have
a stable job, house, and vehicle and be "normal" like anybody else. However, Johnson does not
believe that Tamara can meet the needs of her children and has not demonstrated that she could meet
those needs in the near future. According to Johnson, it is in the best interest of the children that
Tamara's parental rights be terminated and the children placed for adoption. If Tamara's parental
rights are terminated, McNair and her husband could make a commitment to all three children. After
observing all the parties, Pat Klody ("Klody"), a CASA volunteer and appointed guardian ad litem
of the children, does not think that Tamara can meet the needs of her children. As a result, she
believes Tamara's parental rights should be terminated and all three children placed in the McNair's
home.

 There is some evidence in Tamara's favor. At first, Tamara complied with CPS's service
plan and completed most of the tasks assigned to her by CPS. Tamara and I.R.S. both tested
negative for drugs when I.R.S. was born. Further, Tamara obtained a job and appropriate housing,
although neither lasted more than a couple of months. All her children were healthy. Although there
is some conflicting testimony regarding Tamara's alleged prostitution, stability, successful drug
rehabilitation, and whether the children had been physically neglected, the trial court could have
resolved this conflict in favor of its finding. The trial court could have disbelieved Tamara's
testimony that she was stable, that she did not neglect J.C.S.'s asthma, and that her recovery from
drug abuse was progressing. Further, the trial court could have disbelieved that Tamara had the
ability to meet her children's emotional, developmental, and physical needs. Based upon our review
of the record as a whole, we conclude that, although there is some disputed evidence, this evidence
is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor
of its finding and formed a firm belief or conviction that termination of Tamara's parental rights is
in the best interest of H.M., J.C.S., and I.R.S. Accordingly, Appellant's sole issue is overruled.


Conclusion

 Based upon our review of the record, we conclude that the evidence is factually sufficient and
that the trial court did not err in finding that terminating Kathryn's parental rights was in the best
interest of H.M., J.C.S., and I.R.S. Therefore, the judgment of the trial court is affirmed.



 SAM GRIFFITH 

 Justice




Opinion delivered April 14, 2004.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.

























(PUBLISH)