Opinion issued February 22, 2007 















Opinion
issued February 22, 2007










 

 

 

 




 

 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NOS. 
01-05-01187-CV

      
01-05-01188-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



JAMES MONROE, JR., JAMES MONROE, SR., AND SHANA
MONROE, Appellants

 

V.

 

ALTERNATIVES IN MOTION, COREY WILLIAMS, AND ANGELA
WILLIAMS, Appellees

 

 



On Appeal from the 328th District Court

Fort Bend County, Texas








Trial Court Cause Nos. 03-CV-131782 and 03-CV-131782A

 

 



O P I N I O N

 

          Appellant James Monroe, Jr. (“James
Jr.”), together with James Monroe, Sr. (“James Sr.”) and Shana Monroe (James
Sr. and Shana will be known collectively as the “Monroes”) appeal the trial
court’s order terminating the parental rights of James Jr., and appointing appellee
Alternatives in Motion (“AIM”) as the sole managing conservator of J.A.M.J., a
minor child.[1]  In three issues, James Jr. and the Monroes
contend (1) the trial court erred in failing to appoint the Monroes as joint
managing conservators of J.A.M.J. in accordance with James Jr.’s designation in
his affidavit of voluntary relinquishment of parental rights, (2) the trial
court abused its discretion in not granting conservatorship rights to the
Monroes, and (3) the trial court abused its discretion in denying the request
for a trial by jury.  We conclude that
(1) the evidence is legally sufficient to support the trial court’s
presumed finding that James Jr.’s affidavit of relinquishment was voluntarily
executed, (2) the trial court did not abuse its discretion in
denying conservatorship rights to the Monroes,
and (3) the trial court did not abuse its discretion in denying the request for
a trial by jury.  We therefore affirm.

Background

          Jaculynn
Rochelle Jackson and James Jr. are the biological parents of J.A.M.J.  While Jaculynn was pregnant with J.A.M.J.,
she decided to present her for adoption. 
Jaculynn contacted AIM, an adoption agency, and executed an affidavit of
status naming James Jr. as the father of J.A.M.J.  Ronald Landry, an employee of AIM, attempted
to contact James Jr. on several occasions but the Monroes—James
Jr.’s parents and the paternal grandparents of J.A.M.J.—refused to allow James
Jr. to speak with Landry because James Jr. was only seventeen at the time.  AIM filed this lawsuit in September 2003,
seeking to terminate the parent-child relationships between Jaculynn, James
Jr., and J.A.M.J., and to have AIM appointed sole managing conservator of
J.A.M.J.    

J.A.M.J. was born on November 24,
2003.  Shortly thereafter, Jaculynn
executed an affidavit of voluntary relinquishment of parental rights,
designating AIM as managing conservator of J.A.M.J.  On November 26, 2003, AIM placed J.A.M.J. with
appellees Corey and Angela Williams (the “Williams”), the prospective adoptive
parents chosen by Jaculynn and pre-approved by AIM.  The Williams live in North Dakota.

After J.A.M.J. was born, the trial
court issued sanctions to force James Jr. to submit to a paternity test.  DNA testing confirmed James Jr.’s paternity
in December 2004.  In June 2005, the Monroes intervened in
this lawsuit, seeking to be appointed joint managing conservators of
J.A.M.J.  The Williams intervened in this
suit as well, seeking to adopt J.A.M.J. 
In October 2005, James Jr. executed an affidavit of voluntary
relinquishment of parental rights, naming the Monroes as managing conservators and
prospective adoptive parents.  The trial
court held a bench trial in November 2005. 
At the conclusion of the trial, the court terminated the parental rights
of both Jaculynn and James Jr., and appointed AIM as the sole managing
conservator of J.A.M.J.

Relinquishment of Parental Rights

          In
their first issue, James Jr. and the Monroes contend that the trial court erred
in failing to appoint the Monroes
as joint managing conservators of J.A.M.J. in accordance with James Jr.’s
managing conservator designation in his affidavit of voluntary relinquishment
of parental rights.  Specifically, James
Jr. and the Monroes contend that James Jr. was fraudulently induced to execute the
affidavit because the trial court did not comply with James Jr.’s managing
conservator designation.  AIM and the
Williams respond that a designation of a managing conservator in an affidavit
of voluntary relinquishment of parental rights does not bind a trial court, and
the best interest of the child is determinative with regard to the appointment
of conservators.

The Texas Supreme Court has held that the
natural right between parents and their children is one of constitutional
dimensions.  See Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); In
re G.M., 596 S.W.2d 846,
846 (Tex.
1980); Wiley v. Spratlan,
543 S.W.2d 349, 352 (Tex. 1976).  Therefore, termination proceedings must be
strictly scrutinized in favor of the parent.  In re V.R.W., 41 S.W.3d 183, 190 (Tex. App.—Houston [14th Dist.] 2001, no pet.), overruled on other grounds,
In
re J.F.C., 96 S.W.3d
256, 267 n.39 (Tex. 2002); see also
G.M., 596 S.W.2d at 846; Cawley
v. Allums, 518 S.W.2d 790,
792 (Tex.
1975).

Family Code section 161.001 authorizes a trial
court to terminate a parent-child relationship if the court finds by clear and
convincing evidence that the parent has executed an unrevoked affidavit of
relinquishment of parental rights, and termination is in the best interest of
the child.  Tex. Fam. Code Ann. 
§ 161.001(1)(K), (2) (Vernon
Supp. 2006).  A parent may designate a
competent person, authorized agency, or licensed child-placing agency to serve
as managing conservator of the child in an unrevoked or irrevocable affidavit
of relinquishment of parental rights.  Id.
§ 153.374(a) (Vernon 2002).  “The person
or agency designated to serve as managing conservator shall be appointed
managing conservator unless the court finds that the appointment would not be
in the best interest of the child.”  Id. § 153.374(b); In
re D.R.L.M., 84 S.W.3d 281, 300
(Tex.
App.—Fort Worth 2002, pet. denied) (holding that trial court is not obligated
to comply with appointment of managing conservator in affidavit
of voluntary relinquishment of parental rights if trial court finds that
appointment would not be in best interest of child), superseded by statute on other grounds, Tex. Fam. Code Ann. § 263.405(i) (Vernon
Supp. 2006).  “Section 153.374 clearly provides
that in appointing a managing conservator in such cases, the trial court need
not comply with the parent’s designation of a managing conservator if the
designation is not in the [child’s] best interest.”  Dep’t of Family & Protective Servs. v. Alternatives in Motion,
210 S.W.3d 794, 803 (Tex. App.—Houston
[1st Dist.] 2006, pet. filed).  “A direct
or collateral attack on an order terminating parental rights based on an
unrevoked affidavit of relinquishment of parental rights or affidavit of waiver
of interest in a child is limited to issues relating to fraud, duress, or
coercion in the execution of the affidavit.” 
Tex. Fam. Code Ann. §
161.211 (Vernon 2002).

Implicit in the Family Code is the requirement
that an affidavit of relinquishment of parental rights must be voluntarily executed.  Williams v. Williams,
150
S.W.3d 436, 447 (Tex. App.—Austin 2004, pet. denied);
V.R.W., 41 S.W.3d at 192; Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000, pet. denied); Neal v. Tex. Dep’t
of Human Servs., 814 S.W.2d
216, 218–19 (Tex. App.—San Antonio 1991, writ denied).  Moreover, because an affidavit of
relinquishment waives a constitutional right, it must be made voluntarily,
knowingly, intelligently, and with full awareness of its legal consequences.  V.R.W., 41 S.W.3d at 192; Vela, 17 S.W.3d at 759.  The proponent of the affidavit has the burden to establish by
clear and convincing evidence that the affidavit was executed according to the
terms of section 161.103 of the Family Code. 
Tex. Fam. Code Ann. §
161.103 (Vernon
Supp. 2006); V.R.W., 41 S.W.3d at 192–93; Vela, 17 S.W.3d at 758.  An affidavit of relinquishment in proper form
is prima facie evidence of its validity. 
V.R.W.,
41
S.W.3d at 190.  Once the proponent has met that burden, the
burden then shifts to the affiant to establish by a preponderance of the
evidence that the affidavit was executed as a result of fraud,
duress, or coercion.  Id. at 193; Vela, 17 S.W.3d at 758; see
also Tex. Fam. Code Ann. § 161.211(c).  An involuntarily executed affidavit is a
complete defense to a termination decree.  V.R.W., 41 S.W.3d at 193; Vela, 17 S.W.3d at 759; Neal, 814 S.W.2d at 219.

Because James Jr. and the Monroes had the burden
at trial to establish by a preponderance of the evidence that James Jr. did not
voluntarily execute the affidavit of relinquishment, they must demonstrate on
appeal that the evidence conclusively established all vital facts in support of
their claim.  See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex.
1989).  After the termination trial, the trial court
issued findings of fact and conclusions of law in which it stated, “The Court
finds from clear and convincing evidence that JAMES MONROE, JR. signed a
relinquishment of parental rights to JAMES MONROE, SR. and SHANA MONROE.”  In making this finding, the trial court
necessarily determined that James Jr.’s affidavit was voluntarily
executed.  See D.R.L.M., 84 S.W.3d at 297.  We therefore interpret James Jr. and the Monroes’
appellate attack on the affidavit as a challenge to the legal sufficiency of
the evidence to support the trial court’s presumed voluntariness finding.  See
Tex. R. Civ. P. 299 (omitted
elements are presumed in support of judgment); D.R.L.M., 84 S.W.3d at 297–98.

In a legal sufficiency
challenge by a party with the burden of proof at trial, we examine the entire
record to determine if the proposition contrary to the finding is established
as a matter of law.  See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005); Sterner, 767
S.W.2d at 690.  Only if the
contrary proposition is established as a matter of law will we sustain the
issue.  See City of Keller, 168 S.W.3d at 827; Sterner, 767 S.W.2d at 690.

In determining whether fraud existed in the
execution of an affidavit of relinquishment of parental rights so as to render
the affidavit involuntary, courts look to the circumstances surrounding its
execution.  D.R.L.M., 84 S.W.3d at 296–97;
Vela, 17 S.W.3d at 762.  For example, in Queen v. Goeddertz, the court held that an affidavit of
relinquishment was involuntary when it contained a paragraph stating the father
relinquished his rights “subject to the understanding that I will have
reasonable visitation rights with my child.”  48 S.W.3d 928, 929, 932 (Tex.
App.—Beaumont 2001, no pet.).  In Vela
v. Marywood, the court held
that an affidavit of relinquishment was involuntary when the evidence
conclusively established that the mother wanted to proceed with the adoption
only if she could have post-adoption visits with her child.  17 S.W.3d at 762–63.  The Vela court noted that although the
mother testified that she was not threatened, coerced, or defrauded into
physically signing the affidavit of relinquishment, nonetheless, she did not
know the post-adoption plan she initiated with the adoption agency and the
adoptive family was legally unenforceable. 
Id.
at 763–64.  

In contrast, the court in D.R.L.M. held that an affidavit of relinquishment was voluntary
when the affidavit was properly executed, the affidavit acknowledged that once
parental rights are terminated, the former parent no longer has any say
concerning the child, and the appellant admitted that the judge’s decision
would ultimately determine the fate of her child—despite the parent’s complaint
that the affidavit was involuntary because the trial court did not comply with
the designation of managing conservator contained in the affidavit.  84 S.W.3d at 298–99. 
Similarly, in V.R.W., the
court held that an affidavit of relinquishment was voluntary when there was
evidence that the appellant understood that by signing the affidavit of
relinquishment, she was giving the child up for adoption and forfeiting her
rights to the child.  41 S.W.3d at 193.

The only evidence
introduced at trial regarding the voluntariness of James Jr.’s affidavit of voluntary relinquishment of
parental rights was the affidavit itself. 
James Jr. did not testify.  The
affidavit states, “I freely and voluntarily relinquish to my parents, JAMES
MONROE, Sr. and SHANA MONROE all my parental rights and duties,” and “I understand
that . . . once the Court terminates my parental rights, I have no further say
concerning my child, whether or not my child is adopted then or at some later
time.”  The affidavit also states, “I
designate my parents, JAMES MONROE, Sr. and SHANA MONROE, a prospective
adoptive parent [sic], and as managing conservator [sic] of the child.”  The affidavit further states, “I declare that
I fully understand the meaning of this affidavit of relinquishment and the finality
of my action in signing it, and I am signing it freely, voluntarily, and with
the firm conviction that this decision is the best available alternative for my
child.”  Moreover, the affidavit
acknowledges, 

I fully understand that the termination suit may or
may not be combined with a suit to adopt my child.  I understand that, either way, once the Court
terminates my parental rights, I have no further say concerning my child,
whether or not my child is adopted then or at some later time. 

 

The affidavit was executed in the
proper form.  See Tex. Fam. Code Ann.

§ 161.103; V.R.W., 41
S.W.3d at 190 (“An affidavit of relinquishment in proper form is prima facie evidence of its
validity.”).  The social worker who
performed a social study on the Monroes in
December of 2004 stated in her report that she explained to James Jr. and the
Monroes that the court has the final decision with regard to the placement of
J.A.M.J.  James Jr. was also
represented by counsel at the time he executed his affidavit.  

James Jr. and the Monroes filed a
motion for new trial, but the record contains no indication that the court held
an evidentiary hearing on the motion. 
Additionally, James Jr. and the Monroes did not support the motion with
affidavits or other evidence.  The record
also contains no evidence that James Jr. believed he was executing his
affidavit of relinquishment on the express condition that the court appoint the
Monroes
as managing conservators of J.A.M.J.  

We follow those authorities that hold
that a designation of a managing conservator in a relinquishment affidavit does
not, standing alone, conclusively establish a lack of voluntariness where the
parent is informed that he has “no further say concerning the child.”  See
D.R.L.M., 84 S.W.3d at 297–99; V.R.W., 41 S.W.3d at 193.  We hold that James Jr.
and the Monroes have not conclusively established that James Jr. involuntarily
executed his affidavit of relinquishment of parental rights so as to overcome
the trial court’s finding.  See D.R.L.M., 84 S.W.3d at 297–99
(holding evidence was sufficient to support presumed finding that affidavit of
relinquishment was voluntary); V.R.W., 41 S.W.3d at 193 (same); In re Bruno, 974 S.W.2d 401, 405–06 (Tex. App.—San
Antonio 1998, no pet.) (same).  We therefore conclude the evidence is legally
sufficient to support the trial court’s presumed finding that James Jr.
voluntarily executed his affidavit of relinquishment of parental rights.  

Managing Conservator

In their second issue, James Jr. and
the Monroes contend that the trial court abused its discretion in denying
conservatorship rights to the Monroes.  Specifically, James Jr. and the Monroes
contend that the evidence is legally and factually insufficient to support a
finding that granting managing conservatorship rights to the Monroes would not be in the best interest of
J.A.M.J.  In the trial court’s findings
of fact, the court states that the appointment of AIM as sole managing
conservator is in the best interest of J.A.M.J.  In making this finding, the trial court
necessarily determined that appointment of the Monroes as managing conservators was not in
the best interest of J.A.M.J.  See Tex.
Fam. Code Ann. 
§ 153.374(b) (“The person or agency designated to serve as managing conservator
shall be appointed managing conservator unless the court finds that the
appointment would not be in the best interest of the child.”); D.R.L.M., 84 S.W.3d at 297.  According to Texas Rule of Civil Procedure
299, we presume the trial court found that appointment of the Monroes
as managing conservators was not in the best interest of J.A.M.J.  See
Tex. R. Civ. P. 299 (omitted
elements are presumed in support of judgment).

Family Code section 161.001 authorizes a trial
court to terminate a parent-child relationship if the court finds by clear and
convincing evidence that the parent has executed an unrevoked affidavit of
relinquishment of parental rights and that termination is in the best interest
of the child.  Tex. Fam. Code Ann. 
§ 161.001(1)(K), (2).  

If the court terminates the parent-child
relationship with respect to both parents or to the only living parent, the
court shall appoint a suitable, competent adult, the Department of Protective
and Regulatory Services, a licensed child-placing agency, or an authorized
agency as managing conservator of the child. 
An agency designated managing conservator in an unrevoked or irrevocable
affidavit of relinquishment shall be appointed managing conservator.  

 

Id. § 161.207(a) (Vernon
2002).  A parent may designate a
competent person, authorized agency, or licensed child-placing agency to serve
as managing conservator of a child in an unrevoked or irrevocable affidavit of relinquishment
of parental rights.  Id. §
153.374(a).  “The person or agency
designated to serve as managing conservator shall be appointed managing
conservator unless the court finds that the appointment would not be in the
best interest of the child.”  Id. §
153.374(b).

We review a trial court’s decision on custody,
control, conservatorship, possession, and visitation matters for abuse of
discretion, and reverse the trial court’s order only if we determine, from
reviewing the record as a whole, that the trial court abused its discretion.  Turner v. Turner, 47 S.W.3d 761, 763 (Tex.
App.—Houston [1st Dist.] 2001, no
pet.).  A trial court abuses its
discretion when it acts arbitrarily or unreasonably, or without reference to
any guiding rules or principles.  Id.  We
view the evidence in the light most favorable to the trial court’s decision and
indulge every legal presumption in favor of its judgment.  Holley v. Holley, 864 S.W.2d 703, 706 (Tex.
App.—Houston [1st Dist.] 1993, writ denied). 
An allegation of legal or factual insufficiency is not treated as an
independent ground of error in this context because the appropriate standard of
review is abuse of discretion.  In re
D.S., 76 S.W.3d 512, 516 (Tex. App.—Houston
[14th Dist.] 2002, no pet.).  Sufficiency challenges
are incorporated into an abuse of discretion determination.  McGuire v. McGuire, 4 S.W.3d 382, 387 n.2 (Tex.
App.—Houston [1st Dist.] 1999, no pet.).

In determining conservatorship and possession
issues, the best interest of the child is always the primary
consideration.  Tex. Fam. Code Ann. § 153.002 (Vernon 2002); Lenz v. Lenz, 79 S.W.3d 10, 14 (Tex. 2002). 
Furthermore, public policy of this State is to (1) assure that children
will have frequent and continuing contact with parents who have shown the
ability to act in the best interest of the child, (2) provide a safe,
stable, and nonviolent environment for the child, and (3) encourage parents to
share in the rights and duties of raising their child after the parents have
separated or dissolved their marriage.  Tex.
Fam. Code Ann. 
§ 153.001(a)
(Vernon 2002).  The burden of proof in
conservatorship cases is a preponderance of the evidence.  Id. § 105.005 (Vernon 2002);
In re W.M., 172 S.W.3d 718, 724 (Tex.
App.—Fort Worth 2005, no pet.) (“The burden of proof in conservatorship cases,
as opposed to termination cases, is a preponderance of the evidence.”); Taylor v. Tex.
Dep’t of Protective & Regulatory Servs., 160
S.W.3d 641, 653 (Tex. App.—Austin 2005,
pet. denied).

Legal and Factual Sufficiency

          In an appeal
from a bench trial, findings of fact have the same weight as a jury’s
verdict.  Amador v. Berrospe, 961 S.W.2d 205, 207 (Tex. App.—Houston [1st
Dist.] 1996, writ denied).  When
challenged, findings of fact are not conclusive if, as here, there is a
complete reporter’s record.  Id.  When there is a reporter’s record, the trial
court’s findings are binding only if supported by the evidence.  Id.  If the findings are challenged, we review the
sufficiency of the evidence supporting the findings by applying the same
standards that we use in reviewing the legal or factual sufficiency of the
evidence supporting jury findings.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).

The test for legal sufficiency is “whether the
evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review.”  City of Keller,
168 S.W.3d at 827.  In making this
determination, we credit favorable evidence if a reasonable fact-finder could,
and disregard contrary evidence unless a reasonable fact-finder could not.  Id.
 So long as the evidence falls within
the zone of reasonable disagreement, we may not substitute our judgment for
that of the fact-finder.  Id. at 822.  The trier of fact is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  Id.
at 819.  Although we consider the
evidence in the light most favorable to the challenged findings, indulging
every reasonable inference that supports them, we may not disregard evidence
that allows only one inference.  Id. at 822.

In reviewing a factual sufficiency point, we
consider all the evidence supporting and contradicting the finding.  Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). 
We set aside the verdict only if the finding is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986).  In a bench trial, the trial court,
as fact-finder, is the sole judge of the credibility of the witnesses.  Sw. Bell Media, Inc. v. Lyles, 825 S.W.2d 488, 493 (Tex.
App.—Houston [1st Dist.] 1992, writ denied).

Analysis

Courts have generally considered nine
non-exclusive factors set out in Holley v. Adams in determining the best
interest of the child.  544 S.W.2d 367,
371–72 (Tex. 1976).  Those factors are (1) the desires of the
child; (2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future; (4)
the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent, which may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the acts
or omissions of the parent.  Id. at 372. 


The court must also consider the list of factors
from Family Code section 263.307.[2]  Tex. Fam. Code Ann. § 263.307(b)
(Vernon 2002); Alternatives in Motion, 210 S.W.3d at 804.  Family Code section 263.307 also states that,
“[i]n considering the factors established by this section, the prompt and
permanent placement of the child in a safe environment is presumed to be in the
child’s best interest.”  Tex. Fam. Code Ann. § 263.307(a).

Considering the pertinent
factors from Holley and section
263.307, we conclude the evidence in this case is legally and factually
sufficient to support the trial court’s presumed finding that appointment of the Monroes as managing conservators would not be in the
best interest of J.A.M.J.  J.A.M.J was two years
old at the time of the termination trial. 
She had lived her entire life with the Williams family in North Dakota and had never met anyone in the Monroe family. 
AIM pre-approved the Williams as prospective adoptive parents and
Jaculynn chose them to raise the child. 
All the reports that AIM received regarding J.A.M.J. stated that she was
in good health and progressing normally. 
Landry testified that J.A.M.J. had bonded with the Williams family and
that a strong family unit is important to a very young child.  He also testified that it would be traumatic
and detrimental to move J.A.M.J. away from the Williams at this point in her
life. 

The Monroes
told Landry shortly after he first contacted them that they did not want
J.A.M.J to be adopted.  The Monroes, however, made no further attempts to contact
AIM in an effort to adopt, support, or make contact with J.A.M.J., even after
she was born.  Landry testified that it
would not be in the best interest of J.A.M.J. to name the Monroes as managing conservators, and that it would
instead be in J.A.M.J.’s best interest to name AIM as managing
conservator.    

Shana testified that
terminating the parental rights of James Jr. would not be in the best interest
of J.A.M.J. unless the court appointed her and her husband as managing
conservators.  Shana admitted that she
and her husband had not provided any necessaries for J.A.M.J., but it was
because they were unable to contact the Williams.  Shana testified that she and her husband
should be named managing conservators of J.A.M.J. because she believes that it
is “very important that [J.A.M.J.] be with her kin people.”  James Sr. testified that at the time of trial,
his family had procured health insurance. 
He also testified that appointment of himself and his wife as managing
conservators would be in J.A.M.J.’s best interest.  At the time of the termination trial, James
Jr. was in jail awaiting trial on aggravated robbery and aggravated assault
charges.  Shana testified that James Jr.
would not live with her and her husband when he gets out of jail.    

A social worker completed
a social study of the Monroe family
in December 2004.  In the study, James
Jr. told the social worker that he planned to move back in with his parents
when he was released from jail.  He also
stated that his parents never abused or neglected him as a child.  The Monroes
have another son named Courtney who is unemployed and lives with his
grandmother.  Courtney told the social
worker that he could not visit his brother in jail because there were several
outstanding warrants for his arrest.  The
Monroes also have a daughter named
TaShana who was once on probation for misdemeanor assault.  TaShana, however, is a good student and plans
to attend college.  Courtney and TaShana
also spoke of their parents in positive terms and told the social worker their
parents had always been fair with regard to discipline.  Courtney, James Jr., and TaShana were usually
punished for bad grades and received “whippings with a belt.”  Shana told the social worker that she
believes that she was an excellent mother. 
James Sr. thought that he was an “average or good” father.    

At the time of the study,
James Sr. was making $1,770 a month as a truck driver.  Shana was making $1,000 a month and operating
two small businesses.  The Monroes were living in a townhouse that they had
been renting for two years in Missouri
 City, Texas.  The Monroes
did not have health insurance at the time of the study.  Both Shana and James Sr. have no criminal
records and deny any history of psychological treatment.  The Monroes
also did not own any items necessary for raising a small child but they were
waiting to purchase these items until they found out if James Jr. was the
father.  

All the references
contacted by the social worker stated the Monroes
would be good parents for J.A.M.J. 
Pastor Bryan Watson described the Monroe
household as a “strong Christian home.” 
Shana acknowledged that J.A.M.J. might have behavior issues if the court
granted conservatorship rights to the Monroes
and moved J.A.M.J. away from the Williams. 
The Monroes told the social
worker, “If this is our grandchild we would like a shot at raising the
child.”  When asked about his motivation
in seeking to make J.A.M.J. a part of his family, James Sr. stated, “I am
backing my son and my wife . . . if they want to do this I support it.”  

          The court also admitted several social studies monitoring
J.A.M.J.’s progress with the Williams. 
The reports state that J.A.M.J. is doing well in all areas of
development, and knows and has bonded with the Williams family.  Both Corey and Angela Williams are very
active in J.A.M.J.’s care and the Williams’ two other children help in any way
they can.  The Williams spend weekends at
the lake in the summer and they enjoy a lot of family time.  Both Corey’s and Angela’s extended families,
as well as the community in general, are very supportive of the Williams’
decision to adopt.  In the opinion of the
social worker, the placement of J.A.M.J. with the Williams is going very well
and the Williams are raising J.A.M.J. in a very secure, stable, and nurturing
environment.  

          The adoptive family assessment conducted on the Williams
family was also positive.  Corey works as
a chiropractor, has a successful practice, and makes about $60,000 a year.  Angela works as a teacher and makes around
$26,000 a year.  The Williams have health
insurance, as well as retirement accounts and life insurance policies.  

The social worker
described Corey as mature and stable, as well as an all-around nice person who
is well-respected in the community.  The
social worker described Angela as being friendly, outgoing, and full of
energy.  Neither Corey nor Angela has a
criminal record.  The Williams have two
boys who were ages eleven and nine at the time of the study.  Both boys are well-mannered, respectful,
polite, and are very happy to have a new sister.  The Williams discipline by either grounding
or revoking privileges.  The Williams
have a four-bedroom home in Lisbon,
 North Dakota and
they regularly attend church.  Although Lisbon does not have an organized adoption support
group, the Williams know other families who have adopted children. 

          Due to a strained relationship with her mother, Angela
moved away from home when she was a senior in high school.  For the next two years, Angela lived with
Fern and Harris Bailey.  Today, the
Baileys consider Angela their daughter and Angela sees them as her family.  The Baileys also helped Angela re-establish
some relationship with her parents. 
Angela’s mother, however, refused to complete a reference for the
purposes of the adoption of J.A.M.J.

          Viewing all the evidence in the light most favorable to the
verdict, and considering the pertinent Holley
and Family Code section 263.307 factors, we hold that the evidence presented
at the termination trial would enable reasonable and fair-minded people to
reach the verdict under review.  See City
of Keller, 168 S.W.3d at 827.  Considering all the evidence supporting and
contradicting the finding, we cannot say the finding is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  See
Cain, 709 S.W.2d at 176.  The evidence is legally and factually
sufficient to support the trial court’s presumed finding that appointment of
the Monroes as managing conservators
would not be in the best interest of J.A.M.J. 
We therefore hold that the trial court did not abuse its discretion in appointing
AIM as sole managing conservator of J.A.M.J.  See Turner, 47 S.W.3d at 763; see
also Lenz, 79 S.W.3d at 19 (holding evidence was sufficient to support
trial court’s conservatorship determination).

Jury Trial

          In their third issue, James Jr. and the Monroes contend
that the trial court abused its discretion in denying their request for a jury
trial.  AIM and the Williams respond that
the trial court did not abuse its discretion because the written request for a
jury trial was not filed at least thirty days before trial.

The Texas Constitution guarantees the right to a
trial by jury.  Tex. Const. art. I, § 15 (“The right of trial by
jury shall remain inviolate.”);
Tex. Const. art. V,
§ 10 (stating that “no jury shall be empaneled in any civil case unless
demanded by a party to the case, and a jury fee be paid by the party demanding
a jury, for such sum, and with such exceptions as may be prescribed by the
Legislature”).  We recognize that “[t]he right to jury trial
is one of our most precious rights, holding ‘a sacred place in English and
American history.’”  Gen. Motors Corp.
v. Gayle, 951 S.W.2d 469,
476 (Tex. 1997) (quoting White v. White, 196
S.W. 508, 512 (Tex. 1917)).  A party may demand a jury trial in cases
governed by the Family Code, except in suits where adoption is sought, and in
suits to adjudicate parentage under Chapter 160.  Tex.
Fam. Code Ann. § 105.002(a)–(b) (Vernon
Supp. 2006).  

We review the trial court’s denial of a party’s
demand for a jury trial under an abuse of discretion standard.  Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d 664, 666 (Tex. 1996).  In conducting an abuse
of discretion review, we examine the entire record.  Id.  We only find an abuse of discretion when the
trial court’s decision is arbitrary, unreasonable, and without reference to guiding
principles.  Id.  

A request for a jury
trial and payment of the jury fee must be made “a reasonable time before the date
set for trial of the cause on the non-jury docket, but not less than thirty
days in advance.”  Tex. R. Civ. P. 216; Huddle v. Huddle, 696 S.W.2d 895, 895 (Tex. 1985) (holding that time
limitations for requesting jury trial apply to payment of jury fee as well).  A jury request and jury fee
payment by one party inures to the benefit of all other parties to the suit,
even if the requesting party is absent at trial.  See Gen. Motors Corp. v. Gayle, 924 S.W.2d 222, 225 n.1 (Tex. App.—Houston [14th
Dist.] 1996, orig. proceeding), leave
granted, mand. denied, 940 S.W.2d 598 (Tex.
1997); Roberts
v. Mullen, 417 S.W.2d 74, 77 (Tex. Civ. App.—Dallas 1967)
(“It is well settled that when one party demands a trial by jury
and pays the required jury fee, the right thus secured to him inures to all
other parties to the suit.”),
aff’d, 423 S.W.2d 576,
579 (Tex. 1968).
 

It is within the discretion of the trial court
to deny a jury trial in the absence of a timely request or payment of a jury
fee.  Huddle, 696 S.W.2d at 895; Martin v. Black, 909
S.W.2d 192, 197 (Tex. App.—Houston [14th Dist.] 1995, writ denied).  An untimely jury demand should be granted,
however, if it
can be done (1) without interfering with the court’s docket, (2) delaying the
trial, or (3) injuring the opposing party. 
See Ferguson v. DRG/Colony N., Ltd., 764 S.W.2d 874, 881 (Tex. App.—Austin 1989, writ denied); see also Barkhausen v. Craycom, Inc., 178 S.W.3d 413, 418
(Tex. App.—Houston [1st Dist.] 2005,
pet. denied) (holding that even if party fails to timely pay jury fee, trial
courts should accord right to jury trial if it can be done without interfering
with court’s docket, delaying trial, or injuring opposing party); Gayle, 951 S.W.2d at 476 (same).

          Here, the Monroes
intervened in this suit on June 27, 2005. 
James Jr. paid the jury fee on July 13, 2005, but did not file a written
request for a jury trial at that time. 
James Jr. paid another jury fee on September 1, 2005, but once again did
not file a written request for a jury trial. 
He then filed a written request for a jury trial on October 25, 2005,
one week before the November 1 trial setting. 
The trial court denied James Jr.’s request for a jury trial on November
1, 2005, the day of the termination trial. 
The November 1 trial setting was at least the fourth time this case had
been set for trial, a case involving the termination of parental rights and
determination of the home for a then two-year-old child.    

The trial court did not
abuse its discretion in denying the request for a jury trial in this case.  See
Gayle, 924 S.W.2d at 225 n.1.  James Jr. paid the jury fee more than thirty
days before trial on two separate occasions, but he did not file a written
request for a jury trial until one week before the November 1 trial setting.  See Tex. R. Civ. P. 216; see also Huddle, 696 S.W.2d at 895;
Martin,
909 S.W.2d at 197.  The Monroes and James Jr. did not attempt to
demonstrate that granting the request for a jury trial would not interfere with
the court’s docket, delay the trial, or injure the opposing parties.  Furthermore, no party moved for
a continuance following the denial of the jury request.  Halsell
v. Dehoyos, 810 S.W.2d 371, 371 (Tex. 1991) (holding that untimely request
for jury trial becomes timely when trial is thereafter reset more than thirty
days after request).  We hold that the
trial court did not abuse its discretion in denying the request for a jury
trial.  See Huddle, 696 S.W.2d at 895
(holding trial court did not abuse its discretion in denying request for jury
trial when plaintiff timely paid jury fee but did not timely request jury
trial); Barkhausen, 178 S.W.3d at 418
(holding trial court did not abuse its discretion in denying request for jury
trial when request was untimely).

Conclusion

          We hold that (1) the evidence is legally sufficient to support
the trial court’s presumed finding that James Jr.’s affidavit of relinquishment
was voluntarily executed, (2) the trial court did not abuse its discretion in denying
conservatorship rights to the Monroes,
and (3) the trial court did not abuse its discretion in denying the request for
a jury trial.  We therefore affirm the
orders of the trial court.  Any pending motions are dismissed as
moot.  

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Jennings and Bland.

 











[1] James Jr. and the Monroes also appealed the trial
court’s adoption order in cause number 01-05-01188-CV.  We previously dismissed cause number
01-05-01188-CV for want of prosecution, but later granted the Monroes’ motion for rehearing, and held that
the brief in cause number 01-05-01187-CV shall serve as the brief in cause
number 01-05-01188-CV.  The brief in
cause number 01-05-01187-CV, however, does not challenge the trial court’s adoption
order.  





[2] Family Code section 263.307(b) provides:

(b)
The following factors should be considered by the court, the department, and
other authorized agencies in determining whether the child’s parents are
willing and able to provide the child with a safe environment:

(1) the child’s age and physical and
mental vulnerabilities;

(2) the frequency and nature of
out-of-home placements;

(3) the magnitude, frequency, and
circumstances of the harm to the child;

(4) whether the child has been the victim
of repeated harm after the initial report and intervention by the department or
other agency;

(5) whether the child is fearful of living
in or returning to the child’s home;

(6) the results of psychiatric,
psychological, or developmental evaluations of the child, the child’s parents,
other family members, or others who have access to the child’s home;

(7) whether there is a history of abusive
or assaultive conduct by the child’s family or others who have access to the
child’s home;

(8) whether there is a history of
substance abuse by the child’s family or others who have access to the child’s
home;

(9) whether the perpetrator of the harm to
the child is identified;

(10) the willingness and ability of the
child’s family to seek out, accept, and complete counseling services and to
cooperate with and facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the
child’s family to effect positive environmental and personal changes within a
reasonable period of time;

(12) whether the child’s family
demonstrates adequate parenting skills, including providing the child and other
children under the family’s care with:

(A) minimally adequate health and
nutritional care;

(B) care, nurturance, and appropriate
discipline consistent with the child’s physical and psychological development;

(C) guidance and supervision consistent
with the child’s safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to
violence even though the violence may not be directed at the child; and

(F) an understanding of the child’s needs
and capabilities; and

(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.

 

Tex. Fam. Code Ann. § 263.307(b) (Vernon 2002).